**In the MATTER OF the LIQUIDATION OF NATIONAL HERITAGE LIFE INSURANCE COMPANY.**

**Civil Action No. 13530.**

Court of Chancery of Delaware,
New Castle County.

Submitted: April 29, 1998.
Decided: May 13, 1998.

Kevin Gross, of Rosenthal, Monhait, Gross & Goddess, Wilmington, Delaware, Robert Tally, Winston–Salem, North Carolina, for Zinzow and Associates, Inc.

Todd M. Finchler, of Tybout, Redfearn & Pell, Wilmington, Delaware, Brian J. Spano, and Franklin D. O'Loughlin, of Rothgerber, Appel, Powers & Johnson, Denver, Colorado, for National Organization of Life and Health Insurance Guaranty Associations.

Diane J. Bartels, of Bartels & Bartels, Wilmington, Delaware, for Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as the Receiver of the National Heritage Life Insurance Company in Liquidation.

## OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

Before the Court are cross-motions for summary judgment on a claim for payment of a finder's fee as an administrative expense of this liquidation proceeding. Because there is no prospect that the Estate will ever have sufficient assets to pay claims of general creditors, claimant must establish that his claim (which is opposed by the Receiver) is entitled to priority as an administrative expense of the Estate. Because I conclude that the claim is not entitled to such priority, and for other reasons discussed, *infra*, I will deny claimant's motion and grant summary judgment against him.

## II. BACKGROUND

On May 25, 1994, this Court entered a Rehabilitation and Injunction Order ("Rehabilitation Order") against National Heritage Life Insurance Co. ("NHL"), a Delaware corporation, and appointed the Honorable Donna Lee H. Williams, Insurance Commissioner of the State of Delaware, as the Receiver for NHL. Mr. George J. Piccoli was appointed Special Deputy Receiver. On November 21, 1995, this Court entered a Liquidation and Injunction Order ("Liquidation Order") against NHL, and ordered the Receiver to marshall, liquidate and distribute the assets of NHL pursuant to the Delaware Rehabilitation and Liquidation Act, 18 *Del.C.* §. 5901–5944.

Chapter 44 of Title 18 of the Delaware Code ("Delaware Life and Health Insurance Guarantee Association Act") creates a scheme for the protection of life and health insurance policy holders in the event the company issuing the policy fails in the performance of its contractual obligations due to its impairment or insolvency. Many of the other states have enacted similar statutes. The insolvency of NHL triggered the statutory obligations of the Delaware guarantee association and of twenty-two other state life and health guarantee associations to "[g]uarantee, assume or reinsure, or cause to be guaranteed, assumed or reinsured the covered policies of residents" of Delaware and those other states. *See, e.g.,* 18 *Del.C.* § 4408(2)(a). Of the $420 million worth of contractual obligations owed to NHL policyholders at the time of the entry of the Liquidation Order, approximately 95% were covered by one of the twenty-three guarantee

associations. The activities of these associations in connection with NHL's insolvency were coordinated through the National Organization of Life Health Guaranty Associations ("NOLHGA").

In order to ensure continued benefits to NHL's policyholders, the twenty-three guarantee associations, through NOLHGA, entered into an Agreement for Assumption Reinsurance ("AAR") with the Metropolitan Life Insurance Company ("MetLife"). This agreement resulted from a competitive bidding process in which NOLHGA prepared and distributed an offering memorandum to potentially interested life insurance companies, and solicited and evaluated bids. NOLHGA chose MetLife as the successful bidder and then negotiated the terms and conditions, of the AAR.

The AAR was executed by the Receiver, NOLHGA and MetLife on or about February 28, 1996. It was approved by this Court on May 29, 1996 and closed on July 2, 1996. At closing the twenty-three guarantee associations transferred to MetLife cash and promissory notes in excess of $400 million to guarantee the statutorily covered contractual obligations owed to NHL policyholders.[1] No cash or other assets of the NHL Estate were transferred to MetLife at closing. The role of the Receiver as a party to the AAR was to transfer to MetLife the 5% of contractual obligations owed to NHL policyholders which are not covered by the guarantee associations, due primarily to dollar value limitations included in the statutory schemes. MetLife has no obligation to perform those contractual obligations unless and until NHL transfers to it assets to cover the obligations.

Claimant Zinzow objected to the petition for approval of the AAR on grounds that he or his company (collectively, "Zinzow") were entitled to be paid a fee, in connection with the closing of the AAR, in the amount of $436,007. Zinzow predicated his claim on a February 17, 1994 letter agreement between his sole proprietorship, Zinzow & Associates, and NHL, signed for NHL by George W. Hansen, who was Vice President and Chief Actuary of NHL ("February 17, 1994 Agreement"). That agreement provides, in pertinent part, as follows:

> You [i.e. NHL] have expressed interest in the ceding of annuity reserve to another insurance company. In the event we introduce you to such a company and you thereafter conclude a reinsurance or coinsurance transaction, our fee for that introduction shall be the market value of assets transferred by National Heritage in support of reserves and claim liabilities, multiplied by .1%, subject to a minimum fee of $50,000.... We shall be entitled to our fee upon closing of the transaction. No fee is payable unless the acquisition is made. Our services are being rendered on a nonexclusive basis.

The agreement goes on to list MetLife as one of the companies to which Zinzow had introduced NHL.[2]

Zinzow also had an "acquisitions fee agreement" with MetLife pursuant to which he claimed entitlement to a fee as a result of MetLife's participation in the AAR. It appears that Zinzow's claim against MetLife has been settled, and he has been paid $150,000 in connection therewith.

Zinzow does not claim to have entered into any contract, either oral or written, with Special Deputy Receiver Piccoli (who manages the affairs of NHL on behalf of the Receiver). He also does not claim that Spe-

1. The guarantee associations became subrogated by statute to the rights of the policyholders against the NHL Estate. *See, e.g.,* 18 *Del.C.* § 4408(8)a.

2. This agreement appears to have replaced a letter agreement dated December 14, 1992, between NHL and The Mitchell Group, an organization with which Zinzow maintained some relationship. This earlier agreement provided:
   > In the event I introduce you to such a company (block) and you thereafter conclude a transaction, that is through either a coinsurance or assumption reinsurance transaction, my fee for that introduction shall be the market value of assets transferred by the seller in support of reserves and claim liabilities multiplied by .1%.

   I do not reach the issue whether there is a material difference between the description of a covered transaction in this agreement (which specifically refers an "assumption reinsurance transaction") and the description of such an agreement found in the February 17, 1994 Agreement (which does not).

cial Deputy Receiver Piccoli ever adopted or ratified the February 17, 1994 Agreement. Indeed, Mr. Zinzow does not recall ever having had a conversation with Piccoli wherein that contract was discussed. Nor did he ever receive any written confirmation from Piccoli that the Receiver would honor the February 14, 1994 Agreement. Piccoli testified that he never indicated either orally or in writing to Zinzow that his services were desired in any way in connection with the liquidation of NHL.

Rather, Zinzow's claim is predicated on two distinct strands of argument. First, that his performance under the February 1, 1994 Agreement was complete when he made the introduction of MetLife to NHL, at or about the time of execution of that agreement. As the argument goes, all that remained for him to become entitled to a fee was the entry into an agreement between NHL and MetLife. Second, that, in any event, he performed further introductory services after the entry of the Rehabilitation Order, pursuant to the terms of that agreement, which were either implicitly accepted by or not refused by the Special Deputy Receiver and which had something to do with the negotiation of the AAR. His claim states his position as follows:

4) Both before and after execution of the written agreement with NHL, Mr. Zinzow provided services for the benefit of that insurer by introducing its portfolio of annuities to potential purchasers. Among those potential purchasers was [MetLife], with whom the Receiver herein and [NOLHGA] subsequently entered into [the AAR], which has been approved by this Court, effecting transfer of substantially all of that portfolio.

5) Even before his contract with NHL, Mr. Zinzow had an acquisitions fee agreement with MetLife, and he thus made considerable efforts to provide information and contacts which might lead to an eventual transaction whereby MetLife would acquire the NHL portfolio. His work through [Zinzow & Associates] continued with the knowledge of Deputy Receiver George J. Piccoli, as shown by the letter attached as Exhibit B, and thereafter was carried on notwithstanding the involve-

ment of NOLHGA, as illustrated by the telefaxed transmission attached hereto as Exhibit C.

6) Neither the Receiver herein, her deputy, or any other party sought to terminate the contract with or the service rendered by Mr. Zinzow or [Zinzow & Associates], nor did anyone indicate prior to MetLife's selection that [Zinzow & Associate's] efforts would not be recognized pursuant to the terms of the NHL agreement. On [Zinzow & Associate's] end, the introduction required to activate the fee arrangement had been made, and upon the [AAR's] approval by this Court, the contract fee was fully earned. The Receiver thus became liable for payment of [Zinzow & Associate's] fee.

The record reflects that Zinzow did engage in some, sporadic and unsolicited contact with persons working for the Special Deputy Receiver during the summer of 1994, although the February 17, 1994 Agreement was not discussed in those communications. On September 14, 1994, Zinzow wrote to the Special Deputy Receiver. The dual purposes of the letter were (i) to express Zinzow's complaint that he was being excluded from the Special Deputy Receiver's efforts to find buyers for NHL's portfolio, and (ii) to inform the Special Deputy Receiver of the existence of the February 17, 1994 Agreement and Zinzow's claim to fees thereunder. After making reference to Zinzow's efforts over "the past year or two" "to bring reinsurers to the attention of" NHL, the letter reads, in pertinent part, as follows:

Since we made your office aware of the fact that we have parties interested in either reinsuring the business or, possibly, buying the company, and have kept in touch regularly over the past few months, we were surprised to learn last Friday that Canadian Imperial Bank of New York was engage some time ago and is now nearing completion of their process to seek qualified buyers....

We would ... like to make you aware of other parties whom we have approached and who have expressed at least some, if not significant interest. These are listed in the attached letters of February 17,

1994 and April 28, 1994. Metropolitan Life Insurance Company, in particular, has expressed strong interest in recent months. *Please note also that the letter of February 17 specifies that a contingent fee would be due us from National Heritage should a transaction be completed with a party introduced by us.*

We would ... in particular, appreciate being informed of any developments involving any of the interested parties we have introduced.... (emphasis supplied)

In a letter dated July 24, 1995, Zinzow was advised by counsel for the Special Deputy Receiver that his claim for a fee as an administrative expense of the receivership pursuant to the February 17, 1994 Agreement had been rejected. Zinzow understood that his claim had been rejected by this letter.

Zinzow was never retained as an agent for NOLHGA, and he does not claim that he is owed anything by NOLHGA.

## III. DISCUSSION

### 1. *Standard of Review*

When reviewing this record in the context of these cross motions for summary judgment, I must determine whether there are any genuine issues of material fact that preclude entry of judgment. *Battista v. Chrysler Corp.*, Del.Super., 454 A.2d 286, 290 (1982). In evaluating the record, I will view the facts in a light most favorable to the nonmoving party, accepting as true, evidence uncontroverted by the record. *Id.* A motion for summary judgment will be granted only if no material issues of fact exist and the movant is entitled to judgment as a matter of law. Del.Ct.Ch.R. 56(b); *Technicorp Int'l II, Inc. v. Johnston*, Del.Ch., C.A. No. 5084, Jacobs, V.C., 1997 WL 538671 (Aug. 25, 1997) Mem.Op. at 18. While the moving party bears the initial burden in support of its motion, the burden may be discharged if the moving party demonstrates the absence of evidence supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Finally, I note that the fact that the parties have cross-moved for summary judgment does not, necessarily, amount to a concession by any of them that there are no material issues of disputed facts raised by the other party's motion. *See United Vanguard Fund, Inc. v. TakeCare, Inc.*, Del.Supr., 693 A.2d 1076, 1079 (1997) ("a party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for purposes of its own motion, and does not waive its right to assert that there are disputed facts that preclude summary judgment in favor of the other party").

As discussed, *infra*, the Receiver and NOLHGA are entitled to the entry of an order of summary judgment based on my findings that (i) Zinzow's claim is not entitled to priority as an administrative expense of the Estate, and (ii) the Receiver's participation in the AAR did not give rise to any fee under the terms of the February 17, 1994 Agreement. As these conclusions fully dispose of Zinzow's claim, I find it unnecessary to decide other aspects of the motions for summary judgment raised by the Receiver or by NOLHGA.

### 2. *Pre-filing Services*

■ In part, Zinzow argues that he is entitled to a fee for services performed by him before the entry of the Rehabilitation Order, which services allegedly gave rise to the AAR. It would seem axiomatic, at least as general rule, that a claim for services rendered before the commencement of a receivership can give rise only to a general claim in the receivership and not one entitled to priority as an expense of administration of the Estate.[3] The general rule is that "costs and expenses of a receivership, including compensation for the receiver, counsel fees, and *obligations incurred by [her] in the discharge of [her] duties,* constitute a first charge against the property or funds in receivership...." 66 Am.Jur.2d, Receivers, § 281, p. 98 (footnotes omitted) (emphasis added). The Delaware statutory scheme also

---

**3.** There are statutory exceptions to this rule in the context of insurance company receiverships, *e.g.* for wages due non-officer employees for services rendered within three months of the commencement of the receivership. *See, e.g.,* 18 *Del.C.* § 5926.

recognizes the first priority of these *expenses of administration,* placing them ahead of claims for wages (18 *Del.C.* § 5926) and claims of policyholders, beneficiaries and insureds (18 *Del.C.* § 5918(e)). Zinzow cites no authority for the proposition that a fee for services performed by a broker before the commencement of the receivership, and, indeed, not even in contemplation of it, can be classified as an administration expense. Because such a fee could not have been "incurred by" the Receiver or the Special Deputy Receiver in the discharge of their duties, I conclude that it cannot give rise to a claim as a cost of administration of the Estate. At most, pre-filing services can give rise to a claim by Zinzow as a general creditor.

### 3. Post-filing Services

■ This leaves Zinzow's argument that services performed by him (but never requested by the Receiver) after the entry of the Rehabilitation Order gave rise to the obligation to pay as an administrative cost of the receivership a fee pursuant to the February 17, 1994 Agreement. To say it differently, Zinzow argues that his voluntary, continued performance of services pursuant to the pre-receivership agreement with NHL obligates the Receiver and the Court to recognize his claim to a fee as a cost of administration, although neither the Receiver nor the Court ever authorized him to act on behalf of the Receiver or the Estate. Because I conclude that Zinzow's claim, if permitted, would subvert the proper administration of this and other estates, I reject it.[4]

The record is undisputed that Zinzow was never retained by the Receiver. There is no evidence of any oral or written agreement between them. All Zinzow argues is that, in September 1994, several months after he began having desultory contact with persons employed by the Special Deputy Receiver, he transmitted a facsimile copy of the February 17, 1994 Agreement to the Special Deputy Receiver and expressed, by letter, his expectation that he would be paid a fee in accordance with its terms if NHL entered into a covered agreement. Zinzow does not claim that he ever spoke to the Special Deputy Receiver about the February 17, 1994 Agreement or that the Special Deputy Receiver ever adopted, ratified or even acknowledged the February 17, 1994 Agreement.[5] He argues only that, by not specifically rejecting the February 17, 1994 Agreement until July, 1995, the Special Deputy Receiver "acquiesced" in its existence and became obligated to pay fee related to services performed before the July, 1995 notice of rejection.

In the circumstances presented here, I conclude that Zinzow's claim is not an "expense of the receivership" or an "obligation[ ] incurred by [the Receiver] in the discharge of [her] duties...." 66 Am.Jur.2d, Receivers, § 281, p. 98. While I do not conclude that prior Court approval of the Receiver's rentention of brokers or advisors such as Zinzow is always required,[6] I do conclude that proof

---

4. I find it unnecessary to determine whether Zinzow's activities after entry of the Rehabilitation Order violated the terms of that order. I note, however, that both the Rehabilitation Order, entered May 25, 1994, and the Liquidation Order, entered November 21, 1995, contain the following provision:

> 13. National Heritage and its officers, directors, agents, servants and employees are hereby enjoined and restrained from transacting any business of, or on behalf of, National Heritage ... without the prior written permission of the [Receiver] or until further Order of the Court.

Zinzow learned of the receivership proceedings by the end of May 1994, either from NHL or from published sources. If Zinzow were properly regarded as a "agent" or "servant" of NHL under the February 14, 194 Agreement, his continued activity would have been improper.

5. Zinzow does not claim to have spoken to the Special Deputy Receiver about the February 17, 1994 Agreement or to have received even oral confirmation from the Special Deputy Receiver or anyone working for him that the Receiver desired to continue that agreement in force. His only explanation for the absence of such evidence of ratification or adoption was "I normally don't anticipate somebody is going to reaffirm an agreement that was signed. I gave him notice that I was still expecting payment under that agreement and didn't receive any contrary word from him. So I would take that as an affirmation."

6. The Receiver and NOLHGA seemingly disagree whether prior Court approval of such a contract is a necessary prerequisite for enforceability as an administrative expense, the Receiver arguing that it is not. I do note the various provisions in

that the Receiver actually ratified or adopted the February 17, 1994 Agreement or otherwise contracted with Zinzow for his services is a necessary (if not sufficient) predicate to Zinzow's claim for a fee as an administrative cost of the Estate. Any other rule invites the sort of opportunism here evidenced by Zinzow's uninvited injection of himself into the affairs of the receivership.

Nor does this rule impose an unfair burden on Zinzow or others like him who seek to be compensated for services actually rendered at the request of a receiver appointed by this Court. Persons dealing with court-appointed receivers have notice of receivers' limited powers. Informed self-interest should counsel those who honestly believe they have been retained by such a receiver to provide services in connection with the administration of a receivership to secure adequate written confirmation and, where appropriate, prior court approval, of their retention and the terms thereof. *See, e.g., Moran v. Leccony Smokeless Coal Co.*, 124 W.Va. 44, 18 S.E.2d 816, 817–18 (1942) (rejecting claim for payment of brokerage fee as part of the cost of preserving the corpus of the property in the hands of the receiver: "the approved practice being to classify a charge as cost of the receivership by order entered in advance of incurring the expense").

The circumstances presented here strongly suggest that Zinzow never sought to secure such advance confirmation from the Receiver or the Court because he knew it would be denied. Indeed, his September 14, 1994 letter to the Special Deputy Receiver (enclosing a copy of the February 17, 1994 Agreement) was sent only after Zinzow learned that "Canadian Imperial Bank of New York was engaged some time ago and is now nearing

completion of their process to seek qualified buyers." Thus, even accepting Zinzow's view of the facts, he never communicated with the Special Deputy Receiver to secure any agreement to retain him in connection with the receivership, but only to present a demand that he be compensated in accordance with the February 17, 1994 Agreement. More is required of those who would claim priority over all others, including NOLHGA and policyholders with uncovered claims.

### 4. No Assets of the Estate Were Transferred in the AAR

■ Finally, the evidence on this summary judgment record is sufficient to support a conclusion that, when the AAR was entered into, no fee was due under the February 17, 1994 Agreement. The fee calculation involves multiplying the "market value of assets transferred by National Heritage in support of reserves and claim liabilities" by one-tenth of one percent. Under the terms of the February 17, 1994 Agreement, any such fee was payable at closing. The factual record is undisputed that, at the time the AAR was closed, NHL transferred no cash or other assets at all and, specifically, none "in support of reserves and claim liabilities." All of the cash and other assets transferred to MetLife at closing to cover the statutorily covered contractual obligations owed to NHL policyholders—in excess of $400 million—came from NOLHGA. Thus, the calculation required by the February 17, 1994 Agreement results in zero dollars due to Zinzow.

Zinzow's only response is to argue that the fee should, instead, be calculated on the basis of the value of either the assets transferred by NOLHGA or of the obligations of NHL transferred.[7] Ultimately, Zinzow's resort to

---

the Rehabilitation Order and the Liquidation Order which empower the Receiver to deal with the assets of the Estate. Notwithstanding these provisions, however, the Court has both the authority and the duty, in general, to pass upon the Receiver's actions. Necessarily, some element of judgment and discretion will be brought to bear in considering any application for such approval.

**7.** In his affidavit, Zinzow states as follows:

In our Fee Agreement, the fee is defined to be "the market value of assets transferred by National Heritage in support of reserves and claim liabilities, multiplied by .1%" In section

2.16 of the [AAR], "covered obligation reserves" is defined as "the aggregate amount to be transferred to the Assuming Insurer to support the Covered Obligations," and as such, would be a portion of NHL's assets supporting reserves. "Covered Obligations" are defined in section 2.15 to include the obligations of the Affected Associations which "have arisen or will arise, on or after the Effective Date, in connection with the insurance policies and certificates of NHL...." The gross policy liabilities of NHL, including both covered and uncovered obligations, are disclosed in the

these arguments tends to establish that the AAR is not a transaction covered by or contemplated by the February 17, 1994 Agreement, as NOLHGA and the Receiver vigorously contend. Without deciding that issue, it is nevertheless clear that the fee calculation required by the February 17, 1994 Agreement is not and cannot be read to be based on the market value of assets transferred by NOLHGA, nor is it based on the amount of liabilities transferred by NHL. Thus, Zinzow's argument fails.

## IV. CONCLUSION

For the foregoing reasons, summary judgment will be entered in favor of the Receiver and NOLHGA and against Zinzow with respect to the claim for a fee based on the closing of the AAR or the February 17, 1994 Agreement. The parties are directed to submit an order on notice.

document produced on NHL 104 (copy attached) to be $448,940,020, which appears to be as of the [AAR's] effective date (See.2.21) of

1/1/96. The fee on that transfer would thus be $448,940.