### In re GAYLORD CONTAINER CORPORATION SHAREHOLDERS LITIGATION.

Civil Action No. 14616.

Court of Chancery of Delaware,
New Castle County.

Submitted: Jan. 10, 2000.
Decided: Jan. 26, 2000.

 

Joseph A. Rosenthal, Jeffrey S. Goddess, of Rosenthal, Monhait, Gross & Goddess, Wilmington; of counsel: Steven G. Schulman, Edith M. Kallas, Cary L. Talbot, of Milberg Weiss Bershad Hynes & Lerach, New York City; Stephen Ramos, of Berger & Montague, Philadelphia, PA, for Plaintiffs.

William O. LaMotte III, Karen Jacobs Louden, of Morris, Nichols, Arsht & Tunnell, Wilmington; of counsel: Thomas O. Kuhns, Timothy A. Duffy, of Kirkland & Ellis, Chicago, IL, for Individual Defendants.

Lewis H. Lazarus, of Morris, James, Hitchens & Williams, Wilmington, for Nominal Defendant Gaylord Container Corporation.

## OPINION

STRINE, Vice Chancellor.

In this action, a class of shareholder plaintiffs attacks the decision of the Gaylord Container Corporation board of directors to adopt a series of defensive measures in July of 1995. These defensive measures included: a shareholder rights plan; the elimination of stockholders' right to act by written consent; bylaws requiring stockholders to submit nominations for directorships in the period sixty to ninety days in advance of the annual meeting; a charter provision bringing the company within the reach of 8 *Del. C.* § 203; and the adoption of a supermajority voting requirement to rescind any of the defensive

measures in the charter or amend the company's bylaws by stockholder action. The plaintiffs assert that these measures have unfairly deterred possible acquirors from making an offer for Gaylord and are disproportionate to any threat faced by Gaylord.

The defendants, all members of the Gaylord board of directors, have moved for summary judgment. In support of that motion, the defendants advance evidence demonstrating that in the middle of 1995 Gaylord's dual class voting structure, which had insulated the company from the threat of a coercive takeover, was going to expire and thereby expose the Gaylord stockholders for the first time to the potential duress of an inadequate and/or coercive acquisition offer. In response to this threat, the Gaylord board, after adequate deliberations and upon advice of counsel, adopted a number of garden-variety defensive measures that gave the board the leverage to negotiate with any potential acquiror and to prevent the acquisition of the company at a price unfair to the stockholders. None of these defensive measures, defendants say, is coercive or preclusive, and many companies that have adopted such measures have been the subject of successful acquisition bids. Furthermore, ten of the eleven members of the Gaylord board of directors were non-management directors with no conflicting affiliations.

After a careful consideration of the record, I conclude that the Gaylord board of directors, which is dominated by disinterested and independent directors, after a reasonable investigation: i) acted in response to a legitimate threat that the Gaylord stockholders could be susceptible to an inadequate and/or structurally coercive tender offer (or a rapid proxy contest based on such an offer); and ii) adopted noncoercive and nonpreclusive defensive measures reasonably proportionate to that threat.

Although there is no doubt that the defensive measures constitute obstacles in the path of a potential acquiror, the measures, even taken together, present no insuperable barrier to a hostile acquisition offer. Indeed, the measures leave a hostile acquiror with the clear option of mounting a proxy fight in advance of the Gaylord annual meeting and/or of structuring and financing an attractive and non-coercive acquisition offer that would place the Gaylord board under severe pressure (because of the threat of a successful injunction action) to redeem the rights plan. In the event of an actual offer, it may well be that the Gaylord board's decision to use the defensive measures to block the stockholders from considering the transaction could be deemed unreasonable under the standard of review articulated in *Unocal Corp. v. Mesa Petroleum.*[1] But in the abstract, the Gaylord board's decision to put in place rather ordinary defensive measures in advance of the elimination of the company's dual class voting structure cannot, as a matter of law, be deemed unreasonable.

Therefore, I grant the defendants' motion for summary judgment.

## I. *Factual Background*

### A. *The Defendants*

Defendant Gaylord Container Corporation is a Delaware corporation established in 1986. Headquartered in Deerfield, Illinois, Gaylord manufactures brown "kraft" paper and related brown paper products, such as containerboard, corrugated containers, and various types of brown paper bags and sacks.

Defendant Marvin Pomerantz was one of the founders of Gaylord and is the company's largest stockholder. At all relevant times, he has served as the company's Chairman of the Board and Chief Executive Officer. Over the years, Pomerantz had made it clear that he does not favor a sale of Gaylord except at an extremely

1. *Unocal Corp. v. Mesa Petroleum,* Del.Supr., 493 A.2d 946 (1985).

handsome price. Given his managerial position and his statements opposing a sale, I assume for purposes of this motion that there is a triable doubt whether Pomerantz's support for the defensive measures was influenced or motivated at least in part by his desire to remain as CEO.[2]

The remaining defendants were all members of Gaylord's board at the time the defensive measures were adopted. But none of them was a member of Gaylord's management at any relevant time. None of them has any financial or personal interests in conflict with Gaylord's public stockholders. There is no evidence that any of them were personally beholden to Pomerantz. Nor is there any evidence that the perquisites of Gaylord board service were so lucrative that the directors had any objective reason to cling to office, other than the human tendency to believe that one has something meaningful to contribute.

In fact, all of the directors owned Gaylord stock or warrants to obtain company stock. Before July 31, 1995, defendant Pomerantz controlled roughly 62% of the total shareholder vote, defendant Warren Hayford 9%, and the remaining directors and officers 3%. After July 31, 1995, Pomerantz controlled 12% of the company's outstanding stock, Hayford 5%, and the remaining directors and officers approximately 3%.

Moreover, three of the defendant directors—Frank E. Babb, Norman H. Brown, Jr., and Harve A. Ferrill—were elected to the Gaylord board by a committee of Gaylord bondholders who held warrants giving them a keen interest in increasing the value of Gaylord shares. During the time frame relevant to this dispute, therefore, none of these three directors was subject to removal by Gaylord's stockholders; all three were therefore independent from Pomerantz.

Put simply, ten out of the eleven Gaylord directors were disinterested and independent at the time the actions complained of by plaintiffs occurred.[3]

2. As to this, I note the raging dispute in the briefs about the evidentiary force of May 1995 notes taken by a former Gaylord Vice President, Kathryn Chieger, responsible for the company's communications strategy. In those notes Chieger indicates, among other things, that there is a perception that Pomerantz "will not sell the company," that Pomerantz's statements about the price at which he would be willing to sell were so extreme as to generate that perception, that a rights plan might be viewed as an entrenchment tool rather than "a means of delaying a hostile bid," and that many investors wanted Pomerantz out of control. Pls. Ex. 43. Although these notes are of course colorful, they have little objective evidentiary force, because they have little bearing on why the rest of Gaylord board acted as it did or how the defensive measures operate in practice.

3. The only evidence that the plaintiffs have produced on this point to suggest otherwise is inadequate to create a genuine dispute of fact. First, the plaintiffs allege that all of the Class B directors must be considered non-independent because they were elected by that class at a time when Pomerantz controlled the vote. But the mere fact that a controlling stockholder elects a director does not render that director non-independent. *Citron v. Fairchild Camera and Instruments Corp.*, Del.Supr., 569 A.2d 53, 65–66 (1989).

Second, the plaintiffs allege that director Norman Brown, who was selected by Gaylord's bondholders' committee and who was not subject to re-election during his tenure, was non-independent because he was a Managing Director of Donaldson, Lufkin & Jenrette and had offered DLJ's services in connection with the board's consideration of the defensive measures. Yet Brown's offer was declined, and his uncontradicted affidavit states that "[a]t no time while I was on the Gaylord Board or after my tenure ended, did Gaylord engage DLJ to perform any advisory services." Brown Aff. ¶ 6. Brown admits that DLJ did participate "in a financing of Gaylord bonds" *after he left the board in 1997. Id.* The plaintiffs have had the opportunity for full discovery. The mere fact that Brown offered DLJ's services in connection with advising the board regarding the defensive measures does little to compromise his independence. To the extent that DLJ had been hired, a different finding might be in order. But the plaintiffs have failed to show that Brown feared that a vote against Pomerantz's position on the defensive measures would harm any material financial relationship DLJ

## B. Gaylord's Dual Class Voting Structure

When Gaylord went public in 1988, it had two classes of common stock. Both the Class A and Class B common stock had equal liquidation and equity rights. But the Class B stock had ten votes per share and the Class A stock only one vote per share on matters requiring the approval of all common stockholders.

From the beginning, Pomerantz owned or controlled a majority of the Class B common stock. As a result, Pomerantz could dictate the outcome of any vote requiring the approval of a majority of all Gaylord common stockholders.

## C. Gaylord Restructures And Its Creditors Obtain Substantial Rights

In September 1992, Gaylord restructured itself under Chapter 11 of the federal Bankruptcy Code. As part of that restructuring, Gaylord was required to make concessions to the company's bondholders, who negotiated with the company through a committee.

In exchange for agreeing to refinance Gaylord's debt, the bondholders were given warrants to obtain Class A stock. Those warrants were exchangeable July 31, 1995. In order to protect the bondholders' economic interests, the bondholders' committee demanded a conversion provision that would eliminate the dual class voting structure if Gaylord's stock price did not hit $15.25 a share before the warrants became exchangeable. If Gaylord hit and maintained that target price for a certain period, the dual structure would persist because the bondholders could sell their warrants at a price the committee deemed adequate to recoup the value of the bondholders' original investment.

But if that eventuality did not occur, the bondholders did not want to be left holding warrants for a second-tier class of stock without equal voting rights. As a result,

had with Gaylord, because the plaintiffs have not produced evidence that any such material financial relationship existed. Moreover, the plaintiffs have ignored the fact that Brown owed his service on the board to the bondholders, a fact weighing in favor of independent status.

Third, the plaintiffs challenge the independence of another director selected by Gaylord's bondholders, defendant Frank Babb. As with Brown, the plaintiffs slight the fact that Babb was selected by the bondholders and free from the threat of removal by the stockholders (including Pomerantz). The only support for their challenge is the fact that Babb admitted in his affidavit that the firm of "McDermott Will & Emery has, over the years, done some work for Gaylord." Babb Aff. ¶ 7. Apparently, this work was actually done for the bondholders' committee. Babb was a partner of the McDermott Will firm until 1990 and has served it in an of counsel position since then. But Babb's affidavit also states that he was "not aware of any significant representation undertaken by the firm [for Gaylord], or any significant fees generated from such work, either during or after [his] tenure on the Gaylord board." Id. The plaintiffs had the opportunity to depose Babb but chose not to do so. They have produced no evidence that the McDermott Will firm had a material financial interest in representing Gaylord or that Babb's personal status as of counsel to that firm was material to him and somehow related to the continuation of that firm's relationship with Gaylord. As a consequence, they have failed to generate a genuine dispute of material fact about his independence. Cede & Co. v. Technicolor, Inc. ("Cede II"), Del.Supr., 634 A.2d 345, 363–64 (1993). To the extent the plaintiffs believe that they can wait until trial to generate evidence compromising Babb's independence, they misconceive how Rule 56 operates.

Fourth, the plaintiffs obliquely question the independence of director Hayford, because he owned approximately 9% of the Class B stock at the time the defensive measures were adopted and was one of the founders of Gaylord. At the time of the actions challenged by the plaintiffs, Hayford held no managerial position at Gaylord and his status as a major stockholder with no possibility for exercising voting control himself would seem to heighten his incentive to ensure that the company would entertain a favorable acquisition offer, not dampen it.

Finally, even if Brown, Babb, and Hayford were not independent, that would still leave an eleven member board controlled by seven independent directors.

Gaylord's charter was amended to add the following Article IV, Part 4C:

> All outstanding shares of Class B Common will be converted automatically into an equal number of shares of Class A Common [on] ... July 31, 1995, but only if the Closing Price (as defined herein) of the Class A has not equaled or exceeded $15.25 per share ... on a total of twenty or more Trading Days (as defined herein) ... during any thirty consecutive Trading Days occurring on or prior to July 31, 1995[.]

As part of the restructuring, the bondholders' committee also secured the addition of three directors to the Gaylord board as so-called "Class A directors." Each of these directors was selected by the bondholders' committee to serve terms expiring July 31, 1996. These terms contrasted with the annual terms served by other Gaylord directors. As noted earlier, defendants Babb, Brown, and Ferrill were elected to the Gaylord board by this method.

### D. *The Gaylord Board Faces The Reality That The Dual Class Voting Structure Will Expire*

By the spring of 1995, Gaylord's performance as a company had rebounded, but not to the level where it was likely that the company would avoid the automatic conversion of its Class B stock into Class A. Quite obviously, the elimination of the dual class voting structure made the company more susceptible to the threat of a hostile acquisition offer because Pomerantz would no longer have the votes to dictate the outcome of any stockholder plebiscite.

As a result of the likely termination of Pomerantz's voting control of the company, Gaylord's management sought advice from the company's outside counsel, Kirkland & Ellis, regarding its options. It appears that Kirkland & Ellis explored whether it was possible to stave off the expiration of the dual class structure by a charter amendment enacted through a vote of the Class A and Class B voting together, rather than as separate classes.[4] When it was clear that such an amendment could be accomplished only through separate class votes, Kirkland & Ellis focused on defensive measures that could be presented by Gaylord management to the board for its consideration.

On April 5, 1995, Kirkland & Ellis sent Pomerantz and Gaylord's Chief Financial Officer, Daniel P. Casey, an eighteen-page memorandum reviewing "various mechanisms public companies employ to protect stockholders from raiders."[5] The memorandum explained various options and the processes by which those options could be implemented. The memorandum preliminarily recommended that Gaylord opt into 8 *Del. C.* § 203 and adopt a shareholder rights plan, a staggered board, limitations on the ability of stockholders to call special meetings and act by written consent, advance notice bylaw provisions for director nominations and shareholder proposals, and a supermajority provision to govern stockholder-initiated bylaw changes and certain charter amendments. On May 22, 1995, Kirkland & Ellis followed up with another memorandum to management that went into further detail about these options and the process and timetable for implementing them.

At the Gaylord board's regularly scheduled meeting on May 25, 1995, the board heard Jack S. Levin of Kirkland & Ellis explain these options for the first time and

---

4. The plaintiffs have produced what appears to be an internal Kirkland & Ellis document indicating that elimination of the expiration provision would have required the consent of the Class A stockholders as a class. Pls. Ex. 38. Despite having had the benefit of full discovery, the plaintiffs have produced no evidence that Pomerantz or anyone else at Gaylord ever saw this analysis or requested it. Most important, there is no evidence that the board gave any consideration to this possibility.

5. Defs. Ex. 16.

then discussed them at some length.[6] In this regard, the board minutes state:

Jack Levin of Kirkland & Ellis reviewed with the Board various mechanisms to deal with an unsolicited or coercive takeover of the Corporation. Mr. Levin explained the operation and features of a shareholder rights plan, a staggered board of directors, the anti-takeover provisions of Section 203 of the Delaware General Corporation Law and various amendments to the Corporation's Restated Certificate of Incorporation and By–Laws, including provisions relating to shareholder consents, special meetings of shareholders and removal of directors. Mr. Levin emphasized that these mechanisms are designed to maximize shareholder value by requiring persons interested in acquiring the Corporation to negotiate directly with the Board. The Board discussed the benefits of each of the foregoing mechanisms, as well as the timing of their adoption and the advisability of retaining an investment banking firm. Following the discussions, in which all directors participated and a number of questions were raised and answered, the Board decided to meet next month to review proposed documents and agreements.[7]

At the meeting, the board appears to have given preliminary support to several of the options articulated by Levin, all but one of which could be adopted by the board itself or by a stockholder vote controlled by Pomerantz. During the meeting, no serious divisions among the directors emerged. Rather, all the directors, including the directors elected by the bondholders' committee, supported the adoption of defensive measures to ensure that the company was not subject to a coercive takeover bid in the wake of the elimination of the company's dual class voting structure. According to the other ten directors, Pomerantz, who chaired the meeting, limited his active involvement in the discussion of the defenses and was careful to let the other directors speak their pieces before he articulated his views.

Although the board favored most of the defensive options proposed, the board was not inclined to favor the staggered board proposal. There appear to have been at least three reasons for that. First, the board felt that a staggered board was not particularly necessary, so long as the measures restricting stockholder action by written consent and requiring advance notice of nominations were adopted. Second, Levin advised the board that it was relatively common for boards to adopt rights plans but that in his view it was more out of the mainstream to create a staggered board. Finally, Levin believed that the creation of the staggered board required the assent of the Class A stockholders voting as a separate class and that such approval might not be obtained.

At the end of the meeting, the board decided to give further consideration to a package of defensive measures centering on a rights plan and measures restricting an acquiror's ability to replace the Gaylord board to a proxy fight conducted at the time of the Gaylord annual meeting. The board asked Kirkland & Ellis to provide it with further advice about that package of options and the process for formally adopting it.

In advance of the next meeting scheduled for June 12, 1995, Levin circulated to the board two detailed memoranda outlin-

---

**6.** It is not crystal clear whether the board received the May 22, 1995 Kirkland & Ellis memorandum before or at the May 25, 1995 meeting. The clearest evidence in the record seems to indicate that management did in fact share the memorandum with the directors before the meeting, because Levin recalls that the memorandum was in front of the directors during his oral presentation and that the directors all "appeared to be familiar with the memo." Defs. Ex 28 (Jack S. Levin Dep.), at 307–08. This question is not, in my view, material to the outcome of this motion.

**7.** Defs. Ex. 18 (May 25, 1995 Board Minutes), at 1–2.

ing the recommended options, the process by which they could be adopted, and his advice that the options be implemented through a stockholder vote to occur before the elimination of the dual class voting structure. Such timing would guarantee that there would be no window in which the company would be without protection from a hostile offer. As important, that timing would guarantee adoption of the measures because the votes of Pomerantz would control the outcome—which would not be the case after the Class B was converted into Class A.

At the June 12, 1995 meeting, the Gaylord board unanimously agreed to adopt the following measures:

- *The Rights Plan:* Under the terms of the rights plan, if a party acquires 15% of Gaylord's common stock without the approval of the board, all other holders of Gaylord common stock would have the right to purchase $100 worth of common stock for each share of stock they own at the bargain price of $50. The rights plan was adopted by the Gaylord board and did not require stockholder approval.
- *The "Charter And Bylaw Amendments":*
 - ◆ nominations for election to the board of directors must be made between 60 and 90 days before the annual meeting;
 - ◆ stockholder action may only be taken at a stockholders' meeting, and not by written consent;
 - ◆ special stockholder meetings may be called only by the board of directors or the Chairman of the Board;
 - ◆ the company's bylaws may be amended by a stockholder vote only with the approval of 66 2/3% of the vote;
 - ◆ section 203 of the Delaware General Corporation Law is made applicable to the company; and

 - ◆ the charter provisions implementing all the defensive measures can only be amended with the approval of 66 2/3% of the vote.

All of the Charter and Bylaw Amendments (a.k.a. the "Amendments") required approval of the Gaylord common stockholders voting together, rather than as separate classes. Therefore, the board scheduled a special stockholders' meeting to be held on July 21, 1995, ten days before the dual class voting structure automatically expired. In connection with the vote, the company sent out a detailed proxy statement describing the defensive measures and the board's rationale for recommending their adoption. Because of the timing of the vote, however, the board knew that the measures would receive the votes necessary to secure their approval.

The board believed such timing was advisable because it ensured that there would be no time period during which Gaylord would be defenselessly exposed to a hostile acquisition offer or proxy contest. Moreover, the board knew that it would be easier and cheaper to obtain approval before the conversion, because Pomerantz's votes were sufficient to carry the day. After the conversion, the board would most likely have had to engage a proxy solicitor, and the outcome of the vote could not be guaranteed. As expected, the Charter and Bylaw Amendments were approved on July 21, 1995.

### E. *How The Defensive Measures Work Together*

The practical effect of a Rights Plan such as was adopted by the Gaylord board is obvious: so long as it is in place, it acts as an insurmountable barrier to an acquisition offer not supported by the board. Opting into 8 *Del. C.* § 203 is also a hurdle in an acquiror's path. For all practical purposes, invocation of that section of the DGCL gave the Gaylord board the power to block any merger with a shareholder who owns more than 14.9% but less than 85% of the company's stock.

But the flaw in these otherwise formidable defenses is evident: if a potential acquiror who owns less than 15% of Gaylord's stock can win a proxy fight and replace the board, it can quickly redeem the pill and finish its acquisition. Where a company's charter and bylaws allow a majority of stockholders to replace the board by written consent or to call a special stockholders' meeting to replace the board upon short notice, a potential acquiror can initiate a proxy fight premised on its commitment to make an acquisition offer once it acquires board control. In such a scenario, the fact that a company has a poison pill in place is less significant because the proxy fight can operate as a substitute for a tender offer.

The Charter and Bylaw Amendments proposed by the Gaylord board were designed to prevent an acquiror's attempt to bypass dealing with the board in this manner. Taken together, they prevent (e.g., by disabling stockholders from voting to call a special meeting to replace the board) such efforts by, in essence, creating a single, yearly opportunity for a proxy fight for control of the Gaylord board at the company's annual meeting. To start such a fight, the acquiror must make its intentions known sixty to ninety days in advance of the annual meeting. For an acquiror who wishes to couple its proxy fight with a tender offer, this means that the stockholders must be given at least fifteen days notice in advance of the forty-five days a tender offer is required to remain open under the federal Williams Act. In practical terms, these limitations could delay an effort to take over the Gaylord board anywhere from sixty days to thirteen months.

The supermajority provision of the Charter and Bylaw Amendments rein-forces these limitations by preventing the stockholders from amending the company's bylaws or the defensive measures incorporated into the company's charter by less than a vote of 66 2/3% of the company's outstanding shares.

## F. The Board's Stated Motivations For Supporting The Defensive Measures

The Gaylord board of directors says that they acted for reasons that are quite common in the public company context. In the absence of the dual class voting structure, the board felt that Gaylord's stockholders were exposed to the threat of a coercive acquisition offer. Without defensive measures, a hostile acquiror could, the board feared, make an inadequate and/or coercive offer for Gaylord at a time when its stock price was depressed and acquire control at an unfair price.[8] This was a real risk, according to them, because the brown paper products industry is a highly cyclical one in which stock prices fluctuate wildly in relation to the prices of raw materials. A self-interested acquiror could therefore choose to make an offer at a premium to market value during a down cycle. In such a situation, a majority of stockholders might, depending on the structure and timing of the deal, be coerced or rushed into accepting an offer that was less than optimal.[9]

The record indicates that the Gaylord board did not act in reaction to "any known effort to acquire the Company's stock."[10] The plaintiffs have not presented any evidence indicating that the board acted in response to feelers from a potential suitor which was poised to make a hostile (or friendly) acquisition offer in the summer of 1995. Rather, the sole basis for the board's timing was the imminent

8. The board does not claim that the summer of 1995 was a down period in the industry cycle; rather, the industry seemed to be doing well at that point.

9. In this regard, the defendants have produced evidence that the industry has in fact experienced quite a bit of mergers and acquisitions activity.

10. Defs. Ex. 23 (Special Meeting Proxy Statement, dated July 7, 1995), at 3.

expiration of the dual class voting structure.

Faced with that eventuality, the defendant directors determined that it was in the best interest of Gaylord's stockholders for Gaylord to implement a series of defensive measures that, in the event of an acquisition offer, would serve the following purposes:

- enable the board to negotiate on behalf of the stockholders with any potential acquiror;
- secure time for the board to study the offer;
- give the board breathing room to secure competing offers for the company, if necessary and appropriate; and
- guarantee that the company's stockholders were fully informed before making a decision on an offer.

The board told the Gaylord stockholders that the adoption of these measures "might have the effect of preventing stockholders from realizing an opportunity to sell their shares of Common Stock at higher than market prices by deterring unfriendly offers or other efforts to secure control of the Company. In addition, the Rights Plan and the [Charter and Bylaw Amendments] may have the practical effect of entrenching the Board of Directors and management." [11] Nonetheless, the board contended that the advantages of the defensive measures to stockholders outweighed any negative effects:

> The effect of the Rights Plan ... is to encourage potential acquirors to negotiate with the Board prior to acquiring a large block of the Common Stock and permit the Board to ensure fair treatment for the Company's stockholders in the event of a coercive offer for the Common Stock....
>
> The Board recognizes that certain provisions of the Company's current Restated Certificate of Incorporation and Bylaws, unless amended, could permit the Rights

Plan to be circumvented by the taking of corporate action by certain stockholders (including the replacement of the Board of Directors and the redemption of the Rights Plan) without prior notice to all stockholders or the opportunity to participate in the consideration thereof.... The principal purpose of the [Charter and Bylaw Amendments] is to enhance the effectiveness of the Rights Plan such that its provisions cannot be easily circumvented in a coercive takeover situation.

The principal function of the Rights Plan and the Proposed Amendments, as a whole, is to give the Board of Directors an opportunity and sufficient time to evaluate an acquisition offer and determine if it reflects the full value of the Company and is fair to all stockholders, and if not, to reject the offer or to seek an alternative that meets such criteria. Even in the case of an all cash offer to all stockholders, the Rights Plan and the [Charter and Bylaw Amendments] collectively serve the further function of providing leverage for the Board to facilitate a bidding process and to negotiate for a better price for the stockholders....

[T]he board believes that the interests of the Company's stockholders will best be served by a transaction that results from negotiations based upon a careful consideration of the proposed terms, such as the availability of the benefits of the transaction to all stockholders, the price to be paid to stockholders (including minority stockholders), the form of consideration paid and tax effects of the transaction.

The Board of Directors has carefully considered the potential adverse effects of the Proposed Amendments and has concluded that such adverse effects are substantially outweighed by the benefits the Rights Plan and [the Charter and Bylaw Amendments], as a whole, would

11. *Id.* at 4.

afford the Company and its stockholders.[12]

### G. *Rumors, Rumors, and More Rumors*

Shortly after the board's public announcement of the defensive measures, the first rumors were published that Gaylord might be the subject of an acquisition offer. In an article published less than two weeks after the special meeting proxy was sent out, *Financial World* reported that " '[o]ne money manager believes [Georgia Pacific] is stalking Gaylord Container.' "[13] The report noted the end of Gaylord's dual class voting structure, after which Pomerantz could no longer " 'nix a deal.' "[14] The report also noted that "Gaylord did recently institute a poison pill" and that "hostile takeover-philes will tell you that such pills are placebos for the right price."[15]

Gaylord's earnings in 1995 were apparently quite strong and led analysts to raise their estimates of the company's prospects. Late that same summer, *Business Week* published an article indicating that " 'a major paper and forest-products company has been doing homework in preparation for making a buyout offer for Gaylord[.]' "[16] According to the article, one large investor stated that " 'Gaylord is a pure play in linerboard and containerboard' " and that " 'several paper companies have been filling billion-dollar war chests for acquisitions.' "[17] The article also stated that "Gaylord, despite recent dire straits, is rebounding smartly, with strong earnings growth" but that "[o]n the other hand, Gaylord's stock is selling at 'very cheap price-earnings and price-to-cash flow ratios[.]' "[18] The article did not mention the defensive measures, which by then had been in place for nearly a month and a half.[19]

Another of the rumors in the record was reported on CNBC by Dan Dorfman on November 30, 1995. In that report, Dorfman indicated that three industry players were interested in acquiring Gaylord at a price as high as $20 a share – a price $2\frac{1}{2}$ times Gaylord's then extant trading price of $7 $\frac{9}{16}$ a share.[20] Dorfman's report touted the company's impressive asset values.[21] The defendants note that Dorfman also stated that Pomerantz "may be willing to sell" his block of the company's stock.[22]

Sporadic rumors of Gaylord's attractiveness as a takeover target were published in 1996 and 1998 as well. The defendants note that *Business Week* quoted an analyst's April 1998 comments that Gaylord's management " 'appear[ed] more open ... to the idea of selling the company than in the past' " and that another industry player might pay $16 or $17 a share.[23] The article stated that Pomerantz had said the company was not for sale but was " 'aggressively pursuing all options to enhance

---

**12.** *Id.* at 3–4.

**13.** Compl. ¶ 29 (*quoting* Stephen Taub, *Market Watch: Timber! Will Gaylord fall to GP?*, FIN. WORLD 16 (July 18, 1995)) (hereinafter *"Financial World"*).

**14.** *Id.*

**15.** Defs. Br. at 25 (*citing* Compl. ¶ 31 and *quoting Financial World*, at 16).

**16.** Compl. ¶ 31 (*quoting* Gene G. Marcial, *Inside Wall Street: Buyers Size Up A Tidy Package*, BUS. WEEK 100 (Sept. 4, 1995)) (hereinafter *"Business Week"*).

**17.** Compl. ¶ 32 (*quoting Business Week* at 100) (*quoting* unnamed investor).

**18.** *Id.*

**19.** *Id.*

**20.** Defs. Ex. 37 (Report of Michael A. Marek) ¶ 36; Defs. Br. at 25 (*citing* Compl. ¶ 40; Ans. ¶ 40).

**21.** *Id.*

**22.** *Id.*

**23.** Defs. Ex. 37 (Report of Michael A. Market) ¶ 38 (*quoting* Gene G. Marcial, *Inside Wall Street: Gaylord Snaps to attention*, BUS. WEEK 110 (Apr. 27, 1998)); *see also* Compl. ¶ 31 (referencing this article).

shareholder value.'"[24] On May 1, 1998, Bloomberg News reported that Gaylord shares had risen 75 percent that year, "as investors and analysts speculate that it's one of several paper companies that are takeover targets in an industry overdue for consolidation.... 'If this company exists in 12 months in its present form, I'd be surprised,' said Mark Wilde, an analyst at BT Alex Brown Inc. who has a 'buy' rating on the stock."[25]

As of today, none of these rumors has panned out. Although each rumor stimulated a short-term increase in the price of Gaylord shares, no actual acquiror has ever emerged and made a bid.

For this reason, this case has some of the feel of a law school hypothetical rather than a live dispute. There has been no actual contest for corporate control during which the defensive measures have come into play. For example, the notion that any of the timing features of the defensive measures has been a barrier over the four and a half years since the adoption of the defensive measures has a rather surreal quality. But it is in this rather abstract context that I must assess whether the defensive measures were properly adopted.

■ As a result, this case requires me in large measure to decide the *per se* validity of a certain combination of defensive measures. It therefore bears heavy emphasis that the fact that certain measures are lawful under the letter of Delaware's corporate law does not mean that those measures can be deployed validly in all circumstances. Where otherwise lawful action is undertaken by directors for inequitable purposes, Delaware courts of course retain the power to protect the corporation and its stockholders.[26]

## II. *Applicable Standards*

### A. *Summary Judgment*

This matter is before me on the defendants' motion for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[27] Of course, the facts must be viewed in the light most favorable to the non-moving party.[28] But this does not mean that the non-moving party can safely stand mute in the face of a summary judgment motion. On the contrary, where the moving party supports its motion with admissible evidence and points to the absence of proof bolstering the non-moving party's claims, the non-moving party must come forward with admissible evidence creating a triable issue of material fact or suffer an adverse judgment.[29]

### B. *The Relationship Between The* Unocal *And Business Judgment Rule Standards Of Review*

In this case, the plaintiffs allege that the Gaylord board violated its fiduciary duties by adopting defensive measures for the primary purpose of entrenching themselves in their corporate offices and preventing a "fair and open auction of the Company that would maximize sharehold-

---

**24.** *Id.*

**25.** Defs. Ex. 37 (Report of Michael A. Marek) ¶ 39 (*quoting Gaylord Container Shares Gain Steadily on Takeover Speculation,* BLOOMBERG NEWS (May 1, 1998)).

**26.** *Schnell v. Chris–Craft Industries, Inc.,* Del. Supr., 285 A.2d 437 (1971).

**27.** Ct. Ch. R. 56(c).

**28.** *Williams v. Geier,* Del.Supr., 671 A.2d 1368, 1375 (1996).

**29.** *See, e.g., In re Liquidation of National Heritage Life Insur. Co.,* Del. Ch., 728 A.2d 52, 56, *aff'd,* 723 A.2d 397 (1998); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

er value."[30] They contend that no legitimate threat to the interests of Gaylord or its stockholders existed to justify the board's decision to implement, through a hasty vote controlled by Pomerantz, draconian defensive · measures constituting "insurmountable obstacles to effective shareholder democracy and insurmountable defenses to an unsolicited takeover."[31]

■ Because the plaintiffs attacked the Gaylord board's decision to adopt defensive, anti-takeover measures, Vice Chancellor Balick held – when denying the defendants' motion to dismiss – that the Unocal test was implicated in this case.[32] That standard of review enables the court to do something that it ordinarily cannot do under Delaware corporate law: examine the substantive reasonableness of the decisions of a board of directors. Not only that, Unocal requires the board of directors to bear the burden of justifying the reasonableness of its actions.[33]

The rationale for this examination was well articulated in Unocal. When a board adopts measures designed to deter or defend against an acquisition offer and thereby also against the possibility that the board and management will lose their positions after the acquisition, there is an "omnipresent specter that [the] board may be acting primarily in its own interests, rather than those of the corporation and its shareholders[.]"[34]

The Supreme Court later summarized the Unocal test for determining whether a board of directors has met its burden to demonstrate the reasonableness of its actions as follows:

> First, a reasonableness test,[35] which is satisfied by a demonstration that the board of directors had reasonable grounds for believing that a danger to corporate policy and effectiveness existed, and
>
> Second, a proportionality test, which is satisfied by a demonstration that the board of directors' defensive response was reasonable in relation to the threat posed.[36]

■ In itself, the Unocal test is a straightforward analysis of whether what a

---

30. Compl. ¶ 48.

31. Id. ¶ 57.

32. Unocal, 493 A.2d 946. This is law of the case. See In re Gaylord Container Corp. Stockholders Litig., Del. Ch., C.A. No. 14616, mem. op. at 7–8, 1996 WL 752356 at *2–3, 1996 Del. Ch. LEXIS 149, at *8–11, Balick, V.C. (Dec. 19, 1996). In so ruling, Vice Chancellor Balick decided to review the "combined effect" of Rights Plan and the Amendments to determine whether they were reasonable under Unocal. Id., mem. op. at 7–8, 1996 WL 752356 at *3, 1996 Del. Ch. LEXIS 149, at *11. On the other hand, in view of his citation to the Delaware Supreme Court's holding in Williams v. Geier, Vice Chancellor Balick also appears to have recognized that only the Rights Plan, and not the stockholder-approved Amendments, were properly subject to Unocal review. Id., mem. op. at. 8, 1996 WL 752356 at *3, 1996 Del. Ch. LEXIS 149, at *9–10 (citing Williams v. Geier, 671 A.2d 1368). The Vice Chancellor explained that "the stockholders approved the amendments whose purported purpose was to increase the effectiveness of the shareholder rights plan" and that therefore "the board's unilateral adoption of the shareholder rights plan is subject to enhanced scrutiny," with

that scrutiny considering "the effect of the rights plan in combination with the amendments." Id. (citation omitted). Because the parties have focused their arguments on this motion solely on the Unocal standard and because Vice Chancellor Balick's opinion contemplated review of the combined effect of the defensive measures, I devote the bulk of my opinion to Unocal. But to the extent Vice Chancellor Balick's opinion leaves this option open to me, I note that Williams v. Geier also supports the result I reach as to the Amendments. See note 80, infra.

33. Unocal, 493 A.2d at 954–55.

34. Id. at 954.

35. The use of the term "reasonableness test" to describe the first Unocal prong is a bit confusing, because both prongs hinge on reasonableness. The first prong is essentially an inquiry into whether the board used a reasonable process to identify a legitimate threat to the corporation.

36. Unitrin, Inc. v. American Gen'l Corp., Del. Supr., 651 A.2d 1361, 1373 (1995) (emphasis in original) (distilling Unocal, 493 A.2d at 955).

board did was reasonable. But *Unocal*'s purpose and application have been cloaked in a larger, rather ill-fitting doctrinal garment. Once the court applies the *Unocal* test, its job is, as a technical matter, not over. If, upon applying *Unocal*, the court finds that the defendants have met their burden of demonstrating the substantive reasonableness of their actions, the court must then go on to apply the normal review appropriate in cases that do not implicate *Unocal*.[37] In essence, the court must reimpose on the plaintiffs the burden of showing " 'by a preponderance of the evidence' " that the business judgment rule is inapplicable.[38] Of course, the business judgment rule exists in large measure to prevent the business decisions of a board of directors from being judicially examined for their substantive reasonableness[39] – an eventuality that has, in the *Unocal* context, already taken place.[40]

Thus after the defendants have met their burden to show that they acted reasonably—a showing that is materially enhanced by the presence of a majority of outside independent directors—in response to a legitimate corporate threat, the plaintiffs must be afforded the opportunity to show that the board's decision should be overturned because it was the product of a breach of one of the traditional duties of loyalty[41] and care.[42] It is not at all apparent how a plaintiff could meet

37. *Unitrin*, 651 A.2d at 1373.

38. *Id.* at 1390 (*quoting Unocal*, 493 A.2d at 958).

39. *Paramount Communications Inc. v. QVC Network Inc.*, Del.Supr., 637 A.2d 34, 45 n. 17 (1993) (where the traditional business judgment rule "is applicable," the court will not examine the "reasonableness" of the board's decision); *see also Unitrin*, 651 A.2d at 1373; R. Franklin Balotti & James J. Hanks, Jr., *Rejudging The Business Judgment Rule*, 48 BUS. LAW. 1337, 1339 (1993) (hereinafter *"Rejudging The Business Judgment Rule"*) ("In its substantive aspect, the rule prohibits a court, absent an abuse of discretion, from substituting its judgment for that of the directors. This substantive aspect is the core of the business judgment rule."); E. Norman Veasey, *The New Incarnation Of The Business Judgment Rule In Takeover Defenses*, 11 DEL. J. CORP. L. 503, 512 (1987) ("In the takeover arena, however, not only will the process be scrutinized, but substantive decisions will be examined for 'reasonableness'—a concept which implies an objective determination by the court. Such a jurisprudential approach has no rightful place in the application of the defensive business judgment rule."); Lyman Johnson, *The Modest Business Judgment Rule*, manuscript at 10 (Nov. 30, 1999) (FORTHCOMING in *Business Lawyer*) (hereinafter *"The Modest Business Judgment Rule"*) ("The business judgment rule is simply a policy of judicial *non-review*.") (emphasis in original). It is true that the business judgment rule leaves it open for a court to conclude that a board decision must be set aside because it cannot be attributed to any rational business purpose. Johnson, *The Modest Business Judg-ment Rule*, at 12 & 12 n. 32. But properly applied, this standard is extremely deferential and can be satisfied only in the most extreme cases.

40. Admittedly, some commentators believe that the *Unocal* standard of review is a "relaxed" one that largely focuses on process rather than the "substantive merits of the [board's] decision," except in circumstances where directors foresake a pure defense of the status quo and seek to impose a management alternative on the stockholders. *See* Marcel Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence*, 19 J. CORP. L., 583, 596, 588, 605–06 (1994); *cf.* Joel Seligman, *The New Corporate Law*, 59 BROOKLYN L. REV. 1, 11, 22 (1993) (opining that Delaware has adopted a very deferential "modified business judgment" standard that "permit[s] tender offer defenses broadly" and has thereby "narrowed the applicability of the duty of loyalty"). If this interpretation is true, the *Unocal* standard has failed to live up to the hopes of other commentators who believed that it could be a potent tool to protect stockholders. *See generally, e.g.*, Ronald J. Gilson & Reinier Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is There Substance to Proportionality Review?*, 44 BUS. LAW. 247 (1989) (hereinafter *"Delaware's Intermediate Standard"*).

41. Within which traditional duty would logically rest the subsidiary requirement to act in good, rather than bad, faith toward the company and its stockholders. *E.g.*, Eric A. Chiappinelli, *The Life and Adventures of Unocal — Part I: Moore The Marrier*, 23 DEL. J. CORP. L. 85, 86 (1998) (hereinafter *"Life And*

this burden in a circumstance where the board met its burden under *Unocal*.[43] To the extent that the plaintiff has persuasive evidence of disloyalty (for example, that the board acted in a self-interested or bad-faith fashion), this would fatally undercut the board's *Unocal* showing. Similarly, it is hard to see how a plaintiff could rebut the presumption of the business judgment rule by demonstrating that the board acted in a grossly careless manner in a circumstance where the board had demonstrated that it had acted reasonably and proportionately. Least of all could a plaintiff show that the board's actions lacked a rational business purpose in a context where the board had already demonstrated that those actions were reasonable, i.e., were rational.[44]

Likewise, it has been held that a board that fails to meet its *Unocal* burden may still prevail by demonstrating that its actions satisfied the exacting entire fairness test.[45] This back-end window is more plausible, because one could posit a scenario where a board's threat analysis (the first *Unocal* prong) was deficient (e.g., it simply adopted defensive measures without conducting a threat analysis) but where the defensive measures it adopted were not draconian, were within the range of reasonableness, and were proportionate to market threats that objectively faced the company. In that scenario, there might be a basis for refusing to enjoin the measures.[46] But in a situation where the board failed to demonstrate that the mea-

*Adventures of Unocal"* ) (defining duty of loyalty as "the duty to act in good faith and in the company's best interest").

Indeed, the very Supreme Court opinion that refers to a board's "triads [sic] of fiduciary duty [sic] – good faith, loyalty, [and] due care," *Cede II,* equates good faith with loyalty. *Cede II,* 634 A.2d at 361; *see also* B. Ellen Taylor, *New And Unjustified Restrictions On Delaware Directors' Authority,* 21 DEL. J. CORP. L. 837, 881 n. 234 (1996) (hereinafter *"New and Unjustified Restrictions"* ) (remarking on the close relationship between good faith and loyalty in *Cede II* ). In the following sentence from *Cede II,* the Supreme Court quotes its earlier opinion in *Barkan v. Amsted Industries, Inc.,* Del.Supr., 567 A.2d 1279, 1286 (1989), but adds bracketed text to clarify meaning. The sentence, with the bracketed text emphasized, reads as follows:

[A] board's actions must be evaluated in light of relevant circumstances to determine if they were undertaken with due diligence [*care* ] and good faith [*loyalty* ]. If no breach of duty is found, the board's actions are entitled to the protections of the business judgment rule.

*Cede II,* 634 A.2d at 368 n. 36 (*quoting Barkan,* 567 A.2d at 1286) (emphases added); *see also* Taylor, *New and Unjustified Restrictions,* at 881 n. 234). In *Barkan* itself, it is clear that the Supreme Court used the terms "due diligence" and "good faith" as a fresh way of referring to the "fundamental duties of care and loyalty" it discussed three sentences earlier in the same paragraph. *Barkan,* 567 A.2d at 1286. Moreover, *Cede II* contains two lengthy sections focusing on the duties of loyalty and care but has no comparable section on good faith, despite its putative equality in the triad. 634 A.2d at 361–66 (loyalty), 366–

71 (due care); *see also id.* at 359 (breaking down key issues on appeal into questions of loyalty and due care).

**42.** E. Norman Veasey, *The Defining Tension In Corporate Governance In America,* 52 Bus. Law. 393, 397 (1997) ("Directors are fiduciaries to the corporation and the stockholders, and owe duties of loyalty and care to both.").

**43.** Chiappinelli, *The Life and Adventures of Unocal,* at 100 ("In theory, once *Unocal* has been satisfied it is open to the plaintiff to show by a preponderance of the evidence that the directors' decisions were primarily based on perpetuating themselves in office or some other breach of fiduciary duty. Practically, how can a plaintiff make such a showing when the board has legitimately found a threat and taken action that is reasonable in relation to that threat?") (citations omitted).

**44.** *See Unitrin,* 651 A.2d at 1374 ("the business judgment rule shields directors from personal liability if, upon review, the court concludes the directors' decision can be attributed to any rational business purpose").

**45.** *Id.* at 1377 n. 18.

**46.** But this scenario might be more rationally addressed by not applying the overall *Unocal* reasonableness test as a rigid, two-question examination, both parts of which must be satisfied to obtain a passing score, but instead as an examination of whether the directors' actions, taken as a whole, were reasonable. *See Unitrin,* 651 A.2d at 1373, 1375–76 (noting that *"Unocal* is not intended to lead to a structured, mechanistic, mathematical exer-

sures themselves were reasonable and not draconian, it seems extraordinarily unlikely that those measures could be deemed "fair."

Fortunately, in practice, the back end of the *Unocal* analysis rarely is an issue. Practitioners recognize that the front end largely disposes of all issues and therefore focus nearly all their energies on the *Unocal* test itself.[47] That is the situation here, and I now turn to an application of that test to the case at hand.

### III. *Legal Analysis*

### A. Unocal *Analysis*

1. *The Evidence Is Insufficient To Support A Finding That The Gaylord Board's Threat Analysis Was Deficient*

█ The first part of the *Unocal* test, the threat analysis prong, requires the Gaylord board of directors to demonstrate that, after a reasonable investigation, it determined in good faith that the expiration of the dual class voting structure created a threat to the corporation justifying a defensive response.[48] "[T]he presence of a majority of outside independent directors will materially enhance such evidence."[49]

cise" but also indicating that, per *Paramount Communications, Inc. v. Time, Inc.*, " 'it is not until both parts of the *Unocal* inquiry have been satisfied that the business judgment rule attaches to defensive actions of a board of directors' ") (*quoting Paramount Communications, Inc. v. Time, Inc.*, Del. Supr ., 571 A.2d 1140, 1154 (1989)).

In this respect, one wonders whether it might also be clearer to reformulate the *Unocal* test so that it incorporates the concept of due deference to board judgment articulated in *Unocal* and *Unitrin* without the confusing burden-shifting required to tie everything to the business judgment and. entire fairness standards of review. *Cf.* Johnson, *The Modest Business Judgment Rule*, manuscript at 1 ("The business judgment rule ... is better understood as a narrow-gauged policy of *non-review* than as an overarching framework for affirmatively shaping judicial review of fiduciary performance.") (emphasis in original). That is, if *Unocal* is the standard of review in a case, perhaps it ought to be the exclusive standard of review.

One tentative approach to such a formulation might be to simply place the burden on the plaintiffs to prove that the directors' defensive actions were a disproportionate and unreasonable or an improperly motivated response to the threats faced by the corporation, based on all of the circumstances (which would include the interests of and care used by the directors who made the decision). *Compare* AMERICAN LAW INSTITUTE, 1 CORPORATE GOVERNANCE PRINCIPLES: ANALYSIS AND RECOMMENDATIONS § 6.02, cmt. a, at 406–08 (1994) (imposing on plaintiff the burden to prove that defensive measures were unreasonable). Such a test

could incorporate the requirement that directors' actions be sustained if they are not draconian and are within the range of reasonable defensive responses. This test would give plaintiffs the opportunity to attack the board's decision directly (a chance plaintiffs do not get in the normal case) and yet preserve for boards a realm of reasonable discretion protected from judicial intrusion. A plaintiff meeting its burden under this standard could obtain appropriately tailored injunctive relief. But a plaintiff seeking to hold directors personally liable for monetary damages would have to demonstrate in addition that each of the directors from whom damages are sought breached one of her fiduciary duties and acted with the scienter necessary to sustain a monetary recovery. *See id.* (advocating a similar approach).

Right now, Delaware's doctrinal approach is premised on the assumption that the world can be viewed clearly by simultaneously wearing three pairs of eyeglasses with different prescriptions (*Unocal*, business judgment, and entire fairness). It is not apparent that this approach works any better in the law than it does in the field of optics.

**47.** Indeed, in *Moran*, the Supreme Court itself collapsed its *Unocal* and business judgment analyses – a recognition of the substantial, if not complete, overlap between the two inquiries. *Moran v. Household Int'l, Inc.*, Del. Supr., 500 A.2d 1346, 1355–57 (1985).

**48.** *Unitrin*, 651 A.2d at 1375; *Unocal*, 493 A.2d at 955.

**49.** *Unitrin*, 651 A.2d at 1375; *Unocal*, 493 A.2d at 955.

In this case, there is no triable issue of fact regarding the independence of ten of the eleven Gaylord directors. None of these directors was a member of Gaylord management or had any material financial interests dependent on the current management's continued control. Thus, the composition of the Gaylord board bolsters the reasonableness of its threat analysis.

Turning to the substance of the board's investigation, it seems beyond dispute that Gaylord was faced with a situation that directors acting in good faith could determine "warranted a defensive response." [50] The expiration of the dual class voting structure opened the door for a controlling position in Gaylord to be purchased through, for example, an inadequate and coercive two-tiered, front-end loaded tender offer.[51]

■ Although there is no record evidence to support a finding that any such offer was imminent, the upcoming expiration of the dual class voting structure was a rational triggering event for an inquiry by the Gaylord board into the adequacy of the company's defenses against coercive and inadequate offers. Delaware law does not require a board to wait until the eve of battle to consider the erection of sound defensive barriers.[52] In fact, our law recognizes that such a requirement would encourage haste rather than due care.[53]

The underlying threats identified by the Gaylord board were ones our law has long recognized as legitimate. In *Unocal* and *Moran*, our Supreme Court recognized that front-end loaded, two-tiered tender offers constitute a threat that can justify defensive action.[54] In *Paramount Communications, Inc. v. Time Inc.*, the Supreme Court held that a board may even act to protect stockholders from the threat of having their shares purchased at a suboptimum price through a fully financed, all cash, all shares (i.e., non-structurally coercive) acquisition offer.[55] And recently, in *Unitrin*, the Supreme Court noted that "the directors of a Delaware corporation have the prerogative to determine that the market undervalues its stock and to protect its stockholders from offers that do not reflect the long-term value of the corporation under its present management plan."[56]

**50.** *Unitrin*, 651 A.2d at 1375.

**51.** The Gaylord board was reacting to the traditional threats posed by over-the-transom acquisition offers. In its *Time* and *Unitrin* decisions, the Supreme Court cited with approval a law review article classifying these threats into three categories: opportunity loss (i.e., the risk that stockholders might be deprived by a hostile offer of the superior benefits of management's strategy or a higher offer); structural coercion (i.e., the risk that disparate treatment of stockholders—e.g., through a two-tiered tender offer—might coerce stockholders into tendering for an inadequate price); and substantive coercion (i.e., the risk that stockholders might mistakenly disbelieve management's view that an offer is too low and tender at an inadequate price). *Unitrin*, 651 A.2d at 1384 (*quoting Time*, 571 A.2d at 1153 n. 17) (*quoting* Gilson & Kraakman, *Delaware's Intermediate Standard*, at 267).

**52.** *Moran*, 500 A.2d at 1350.

**53.** *Id.* ("pre-planning for the contingency of a hostile takeover might reduce the risk that, under the pressure of a takeover bid, management will fail to exercise reasonable judgment"); *see also Unitrin*, 651 A.2d at 1388 ("When a corporation is not for sale, the board of directors is the defender of the metaphorical medieval corporate bastion and the protector of the corporation's shareholders. *The fact that a defensive action must not be coercive or preclusive does not prevent a board from responding defensively before a bidder is at the corporate bastion's gate.*") (emphasis added).

**54.** *Unocal*, 493 A.2d at 956; *Moran*, 500 A.2d at 1357 & 1357 n. 14; *see also Paramount v. QVC*, 637 A.2d at 48 & 48 n. 18 (two-tiered, front-end loaded tender offers are "coercive" and "inherently problematic and should be expected to receive particularly careful analysis by a target board").

**55.** *Time*, 571 A.2d at 1152–53.

**56.** *Unitrin*, 651 A.2d at 1376 (*citing Time*, 571 A.2d at 1152–53). Reasonable minds can and do differ on whether it is appropriate for a board to consider an all cash, all shares ten-

Furthermore, the Gaylord board engaged in a rational deliberative process to define the threat it faced, meeting on two occasions and receiving detailed legal advice from a distinguished outside law firm.[57] This supports the conclusion that the board acted in an informed manner.[58]

In the face of this evidence, the plaintiffs are left with two primary arguments. First, the plaintiffs argue that the imminent expiration of the dual class voting structure could not constitute a "legitimate threat" because that possibility was a specifically contemplated and bargained-for eventuality that would occur if Gaylord did not get its stock price up to $15.25 a share. The mere fact that the expiration would end Pomerantz's voting control and give more voting power to the Class A stockholders could not, therefore, be a threat.

The problem with this contention is that the threat identified by the Gaylord board was not Pomerantz's loss of voting control in itself, but the effect of that loss of control, which was to subject the company to a threat it did not face before the expiration: exposure to hostile acquisition

---

der offer as a threat that permits any response greater than that necessary for the target board to be able to negotiate for or otherwise locate a higher bid and to provide stockholders with the opportunity to rationally consider the views of both management and the prospective acquiror before making the decision to sell their personal property. But it is settled law that a board of directors may view such an offer as requiring a far more substantial response that, depending on the particular circumstances, may pass muster under *Unocal*. *See Time*, 571 A.2d at 1152–53 (specifically distancing itself from Court of Chancery opinions such as *City Capital Associates v. Interco, Inc.*, Del. Ch., 551 A.2d 787 (1988), suggesting that all cash, all shares bids posed a limited threat to stockholders and could justify only measured and time-limited uses of poison pills and other defensive options).

57. The plaintiffs attack the Kirkland & Ellis firm, not on the basis of any errors in the memoranda or legal advice it provided to Gaylord's board, but on the grounds that Kirkland & Ellis was the long-standing outside counsel to Gaylord, had helped Pomerantz take it public, and must therefore be deemed beholden to him. While I have no doubt that Kirkland & Ellis was appropriately loyal towards Pomerantz as a client, it is not clear why I should infer that Kirkland & Ellis would tilt its advice to help Pomerantz if that meant alienating the other ten directors. After all, once the dual class voting structure expired, Pomerantz would no longer have voting control over board elections. Most important, it would be unusual to require a board dominated by independent directors to retain special counsel simply because company counsel of long-standing had a traditional lawyer-client relationship with the company's CEO. Therefore, although it is hardly the most important factor supporting my decision, I believe that the board's reliance on a reputable law firm to advise it regarding its options supports a conclusion that the board acted on an informed basis.

I also reject as inadequate to generate a triable issue of fact the plaintiffs' assertion that the board needed to retain an investment bank in addition to Kirkland & Ellis. In support of this assertion, the plaintiffs twist deposition testimony in an attempt to convince me that the board thought that director Brown, a DLJ managing director, would supply an investment banker's perspective on the defensive measures. What the testimony actually indicates is that the board felt that it was adequately positioned to make a judgment about the defensive measures based on the input of Kirkland & Ellis and company management and using their own business acumen. As to the last point, it is noteworthy that the board was comprised of members with extensive managerial and board experience, as well as one member, Brown, who was an investment banker (and who testified that he discussed the measures during the two board meetings and during one or two conference calls with management), and another, Babb, who was a lawyer.

The plaintiffs point to nothing particularly complex or unusual about the defensive measures that required an explanation from an investment banker. For example, the plaintiffs do not and cannot claim that the terms of the Gaylord Rights Plan (e.g., the 15% trigger) were untraditional.

Likewise, the plaintiffs' claim that the board did not understand the way the defensive measures operated or their possible entrenchment effects is unsupported. The Kirkland & Ellis memoranda explain the measures, which are not all that complicated. And the proxy materials in connection with the vote on the Amendments also spell out the possible entrenchment effects of the measures.

58. *Moran*, 500 A.2d at 1356.

offers that the Gaylord board could not fend off. Nowhere in the record is there evidence that supports the plaintiffs' argument that the expiration provision was intended to create that exposure to acquisition offers; rather, the record is clear that the purpose of the expiration provision was to equalize the voting power of the bondholders in the event that the stock price did not reach a level sufficient to make them whole. In such a circumstance, the bondholders did not want to remain as second-class citizens in a corporation that Pomerantz could dominate through his voting power.

Had the Gaylord board simply identified Pomerantz's own personal loss of control as a threat, I would agree with the plaintiffs' argument that the board did not identify a legitimate threat. But the board did no such thing. Rather, the board focused on the fact that without a controlling stockholder, Gaylord was in a materially different position to fight off acquisition offers and concluded that this change in position generated a vulnerability warranting the erection of defensive barriers. That this decision was in no way intrinsically inconsistent with the expiration provision is demonstrated by the fact that the plaintiffs cannot cite to any language of the expiration provision that the board's actions contravened and the fact that the directors on the board *who had been selected by the bondholders* unanimously supported the defensive measures.

Second, the plaintiffs argue that the expiration did not pose an immediate threat because no takeover offer was imminent. At best, this argument goes to the proportionate nature of the Gaylord board's reaction to the threats identified. That no takeover threat was imminent does not,

however, undercut the fact that the expiration of the dual class voting structure exposed Gaylord to a new threat from inadequate and coercive acquisition offers.

On this motion, Delaware law's long-standing recognition that boards may adopt reasonable defensive measures to deter such offers is dispositive, given the absence of any evidence that the overwhelmingly independent Gaylord board identified the threat as a pretext for their real fear that they would lose their directorial positions.

2. *The Evidence Does Not Create A Triable Issue Regarding Whether The Defensive Measures Were Disproportionate To The Identified Threat*

■ The second prong of the *Unocal* test requires the Gaylord board to demonstrate the proportionality of its defensive measures to the threat it identified.[59] Where, as here, the defensive measures were adopted as an integrated package, "the principles of *Unocal* require that [they] be scrutinized collectively as a unitary response to the perceived threat."[60]

■ The key inquiry under this prong of *Unocal* is whether the defensive measures are "draconian," in the sense of being preclusive or coercive. A defensive measure is preclusive when its operation precludes an acquisition of the company.[61] A defensive measure is coercive when it operates to force management's preferred alternative upon the stockholders.[62] When defensive measures are neither preclusive or coercive, they will be upheld if they fall within the " 'range of reasonableness.' "[63]

■ The array of defensive options adopted by the Gaylord board of directors passes muster under these standards.[64]

**59.** *Unitrin,* 651 A.2d at 1376; *Unocal,* 493 A.2d at 955–57.

**60.** *Unitrin,* 651 A.2d at 1387.

**61.** *Id.*

**62.** *Id.*

**63.** *Id.* at 1387–88 (*quoting Paramount v. QVC,* 637 A.2d at 45–46).

**64.** *Id.* at 1388 n. 38 ("[d]epending upon the circumstances, the board may respond to a reasonably perceived threat by adopting individually or sometimes in combination: advance notice by-laws, supermajority voting

None of the defensive measures precludes an acquisition of the company or coerces the stockholders in some improper manner.

The Rights Plan, for example, is a garden-variety poison pill. Whether or not Delaware law should have authorized the utilization of this extraordinary option in the first instance is water under the M & A bridge. As the Supreme Court has observed, Delaware courts have authorized the adoption of a poison pill in many cases.[65] The primary purpose of a poison pill is to enable the target board of directors to prevent the acquisition of a majority of the company's stock through an inadequate and/or coercive tender offer. The pill gives the target board leverage to negotiate with a would-be acquiror so as to improve the offer as well as the breathing room to explore alternatives to and examine the merits of an unsolicited bid. The adoption of a poison pill is therefore proportionate to the legitimate threats identified by the Gaylord board.

While it is true that a poison pill absolutely precludes a hostile acquisition so long as the pill remains in place, the mere adoption of a garden-variety pill is not in itself preclusive under Delaware law. That is because in the event of a concrete battle for corporate control, the board's decision to keep the pill in place in the face of an actual acquisition offer will be scrutinized again under *Unocal.*[66] In addition, in this case the pill may be redeemed by a new board elected after a successful proxy fight by an acquiror at the Gaylord annual meeting. All an acquiror needs is the necessary votes to elect a new board, which can redeem the pill and allow the offer to go forward.[67] Coupled

provisions, shareholders rights plans, repurchase programs, etc."); *see also Time,* 571 A.2d at 1144 n. 5 (noting that Time had in place a "panoply of defensive devices, including a staggered board, a 'poison pill' ... triggered by an acquisition of 15% of the company, a fifty-day notice period for shareholder motions, and restrictions on shareholders' ability to call a meeting or act by consent").

The defendants' experts, who are researchers at the proxy solicitation firm of Georgeson & Company, Inc., reviewed the experience of 1502 companies listed in the *Corporate Takeover Defenses, 1995* study produced by the Investor Responsibility Research Center ("IRRC"). Defs. Ex. 33 (Georgeson Report). The Georgeson researchers analyzed the defenses in place at 1,228 unregulated companies outside the utility, banking, telecommunications, and insurance industries. *Id.* at 4–12.

Of those companies, 54.4% had in place a rights plan, 42.7% an advance notice requirement for shareholder nominations, 33% a limitation on action by written consent, 31.6% a limitation on the right to call a special meeting, and 15.5% a supermajority requirement to amend the bylaws. *Id.* at 7. When the 706 Delaware corporations in the sample were analyzed, the percentages generally increased: pill (53.8%), advance notice (44.5%), limited action by written consent (48.4%), limited ability to call special meeting (40.8%), and supermajority requirement for amending bylaws (18.6%). *Id.* Moreover, the prevalence of these defenses was even higher among companies in the sample that did not have dual class voting structures. *Id.* at 9. The report indicates that the sample's reliability as to supermajority provisions is somewhat suspect, however, and the researchers therefore reviewed instead the charters of a random group of 21 unregulated Delaware companies drawn from the sample that did not have dual classes of stock or pills. Eighteen had some type of supermajority provision for charter amendments and/or merger approval. *Id.* at 11–12.

By contrast, while the plaintiffs argue that the combination of defenses selected by Gaylord was highly unusual, they cite no evidence to this effect. Moreover, the fact that the combination might be unusual does not make the combination unreasonable.

65. *Unitrin,* 651 A.2d at 1378.

66. *Unitrin,* 651 A.2d at 1378; *see also Moran,* 500 A.2d at 1354 ("When the Household board of directors is faced with a tender offer and a request to redeem the Rights, they will not be able to arbitrarily reject the offer. They will be held to the same fiduciary standards any other board of directors would be held to in originally approving the Rights Plan.").

67. The same analysis is true with respect to 8 *Del. C.* § 203. That statute does not prevent an acquisition altogether; it simply precludes

with the fact that the pill's application in an actual contest for corporate control can be challenged, this option renders the Gaylord Rights Plan nonpreclusive.[68]

As the reader may have already gleaned, I also conclude that the Charter and Bylaw Amendments are not preclusive. The Amendments made it more difficult for an acquiror to obtain control of the Gaylord board. It would, of course, be surprising if defensive measures did not have this effect.

The Amendments were also necessary if the Gaylord board was to address the threats it identified. Market participants are remarkably adaptive. When poison pills became prevalent, would-be acquirors resorted to proxy contests as a method of obtaining indirectly that which they could no longer get through a tender offer.[69] By taking out the target company's board through a proxy fight or a consent solicitation, the acquiror could obtain control of the board room, redeem the pill, and open the way for consummation of its tender offer. The Amendments cut off this short-cut and force an acquiror seeking to obtain control of Gaylord to do so at the annual stockholders' meeting after giving stock-holders adequate time to consider the platforms and qualifications of the contending director slates.

These Amendments are therefore not an ineffectual corporate Maginot Line. But nor are they insurmountable or impossible to outflank. What they do is limit Gaylord's exposure to a proxy fight outside of the company's annual meeting. Although there is no doubt that acquirors would prefer to operate on their own timetables and to take over a board whenever they can muster the necessary votes, the fact that the Amendments force an acquiror to fight its battle at the annual meeting hardly makes them "show stopper[s]." [70] And the fact that an acquiror must make its nomination at least sixty days in advance of the meeting merely lengthens the electoral contest in a way that appears to strike a reasonable balance between the electorate's need to hear out all participants in the debate and the acquiror's need for an adequate opportunity to line up a slate before the meeting.[71] These provisions are far less preclusive than a staggered board provision, which can delay an acquiror's ability to take over a board for several years.[72]

(with certain narrow exceptions) an acquiror who wants to enter into a business combination in the next three years from obtaining control of 15% or more of the company's stock.

**68.** *Moran,* 500 A.2d at 1354–57 (where decision to redeem pill would be reviewed under *Unocal* and where shareholders could engage in proxy fight to remove board, challenge to adoption of a pill failed).

**69.** *Unitrin,* 651 A.2d at 1379 (noting this development).

**70.** *Unitrin,* 651 A.2d at 1383 (quotations and citation omitted). But it bears re-emphasis that the conclusion that the adoption of this approach by a *disinterested board* on a *clear day* was proper does not necessarily validate, for example, similar action by an interested board designed to preclude a particular bidder from mounting a proxy fight or consent solicitation effort under the electoral rules that existed when the bidder made its intentions known.

**71.** Put another way, the measures ensure that the stockholders are fully informed before they make a decision, thus reducing the likelihood that they might vote with the acquiror "in ignorance or based upon a mistaken belief, i.e., yield to substantive coercion." *Unitrin,* 651 A.2d at 1384.

**72.** Even the plaintiffs' own highly qualified expert, Professor Lucian A. Bebchuk, who is quite familiar with the *Unocal* lexicon, is unwilling to opine that the Amendments are preclusive. He is only willing to say that they make a takeover attempt "more difficult" and "less attractive" and that the measures significantly raise Gaylord's "contestability index." Pls. Ex. W (Report of Lucian A. Bebchuk), at 8–9. The last concept is a measure of the strength of takeover defenses articulated in an unpublished paper by one of Bebchuk's academic colleagues. *See* Pls. Ex. X (John C. Coates IV, *The Contestability of Corporate Control: Theory and Evidence,* Prel. Draft., Harvard Law School Seminar In Law and Economics (Oct. 13, 1998)), at 9–15.

The Amendments also leave it open for an acquiror to ask the Gaylord board to schedule a special meeting to elect directors. As is the case with the Rights Plan, the Gaylord board's decision whether to accede to such a request would be reviewable under the particular circumstances then presented.[73] Put differently, the Amendments do not divest the Gaylord board and its Chairman of their fiduciary duties in exercising their now exclusive power to schedule special stockholder meetings. If the board were to refuse such a request without properly informing itself or for reasons inimical to the interests of the Gaylord stockholders, it could open itself up to a successful application for injunctive relief.

Likewise, I fail to see how the supermajority provision can be considered preclusive of an acquisition bid. The most critical fact supporting this conclusion is the reality that an effective fight over board control can occur once a year, rendering

This opinion evidence does not create a triable issue of fact because Bebchuk does not explain how, as a matter of fact, the Amendments operate to unreasonably preclude a takeover. Because defenses are designed to make it "more difficult" to acquire a company, the operative question is whether the defenses are so formidable as to be outside the range of reasonable defensive responses.

In this respect, the defendants' empirical evidence, in concert with Bebchuk's very careful affidavit in which he eschews the option of opining that the measures are preclusive, bolsters the conclusion that the defensive measures are within the range of reason. During the summer of 1998, the authors of the Georgeson report returned to the IRRC data and ascertained whether each of the 1502 companies listed in the *Corporate Takeover Defenses, 1995* report was subsequently acquired. Defs. Ex. 33 (Georgeson Report), at 21–22. The researchers then reviewed whether the premiums paid were higher or lower where the target had in place rights plans and certain additional defensive measures. The authors also analyzed whether the companies with defensive measures were more or less likely to be acquired than companies without such defenses in place, with the percentage by which companies are acquired called the "takeout rate ."

The results of that analysis, which the plaintiffs have not challenged as inaccurate, reveal the following. First, there was no statistically significant difference in the premiums paid for companies with poison pills (34.0%) and companies without (34.1%). Second, the takeout rate for companies with poison pills (11.3%) was not different from the takeout rate for companies without pills (14–15%) in a statistically significant way. Third, companies with both a pill and a classified board received higher premiums (38.8%) than companies with just a pill (23.6%). Fourth, the takeout rate for companies with a pill and a staggered board (11.0%) was only slightly lower than the takeout rate of companies with

a pill and annual election of directors (11.9%). Fifth, companies with rights plans and advance notice for shareholder nominations received average premiums of 36.4% and had a takeout rate of 11.9%. Finally, combining a pill with a provision limiting the ability to call a special meeting resulted in an average premium of 36.6% (compared to 34.1% for companies without a pill) and a takeout rate of 11.3%. *Id.* at 21.

This analysis was consistent with other large studies the authors cite in support of their bottom-line conclusion that:

[t]he adoption of a shareholder rights plan had a positive effect on the likelihood that a company would receive an offer, as well as a positive effect on the premiums associated with companies that did receive an offer. Moreover, we found no statistically significant data showing that the adoption of advance notice requirements, supermajority vote requirements, limitations on action by written consent, limitations on the ability to call a special meeting or any combination of the allegedly "anti-takeover" or "defensive" measures put in place at Gaylord, in addition to a shareholder rights plan, were associated with any negative effects to shareholders. The results of our research are consistent with earlier studies by Georgeson and others that show that so-called defensive measures do not negatively affect the likelihood that a takeover will occur, but appear to be associated with higher offer rates and higher premiums.

*Id.* at 21–22.

While I hinge my ruling almost entirely on the board's actions and the actual way the defensive measures operate, it is important to note that the record is devoid of empirical evidence that supports the proposition that the array of defenses adopted by Gaylord has been shown, through experience in the marketplace, to present an unreasonable barrier to acquisition offers.

73. *Moran,* 500 A.2d at 1354.

the supermajority provision an insubstantial barrier to an acquisition.

In so ruling, I recognize that the supermajority provision makes it very difficult to amend the corporation's bylaws and the other defenses without the support of Gaylord's board. Although the vote requirement was only lifted to 66 2/3%, this is no trivial hurdle given the likelihood that less than a 100% turnout can be expected. At the same time, I cannot say that the necessary vote is not theoretically achievable. Pomerantz holds only 12% of the vote and is not in a position to block the electorate. It is true that the other directors and Gaylord management hold another 8% of the stock. But the directors' share of that percentage[74] cannot be lumped together with Pomerantz's shares because none of those directors is a manager or has an interest (beyond mere board service) conflicting with the interests of Gaylord's stockholders. In the absence of countervailing evidence, these stockholder-directors "are presumed to act in their own best economic interests when they vote...."[75]

After *Unitrin*, it is not clear that the supermajority provision can be deemed preclusive, given this distribution of voting power. In that case, the Supreme Court held that the fact that a repurchase program would place as much as 28% of the stock in directors' hands did not necessarily preclude a successful proxy fight in a vote requiring a majority of the outstanding shares, assuming a 90% turnout.[76]

But I need not and do not reach this question, because the supermajority provision does not subject *all* charter changes to a 66 2/3% stockholder vote. Only those provisions of the charter that were part of the defensive measures are subject to the supermajority requirement. Moreover, the supermajority requirement for bylaw changes only applies to stockholder-initiated bylaw amendments. Therefore, it is

not clear to me why the supermajority provision would hamper the ability of a new board to manage the company with the necessary flexibility. If such a board wished to amend any of the bylaws, it could do so itself without a stockholder vote. And if a new board wished to restore the stockholders' ability to act by written consent, for example, it could propose a charter amendment and solicit proxies in connection with the annual meeting if it wished to do so efficiently.

In sum, because a majority of the stockholders can elect a new insurgent board at the annual meeting without impairment by the supermajority provision and because that board will have the necessary managerial flexibility to run the company efficiently, that provision has little additional defensive bite. It simply reinforces the elimination of the option of removing the board by written consent.

Nor is there evidence that creates a dispute of fact for trial regarding whether the defensive measures are coercive. In this respect, the plaintiffs' argument becomes a bit confusing. Seizing on the fact that a defensive measure is coercive if it forces management's preferred alternative on the stockholders, the plaintiffs contend that the Charter and Bylaw Amendments were intrinsically coercive because the Gaylord board caused the vote on them to occur while Pomerantz still had voting control and could ensure their passage. This ingenious argument is flawed, however, in several respects.

Initially, it seems to me clear that the primary thrust of the coercion prong of *Unocal* is to enable the court to vitiate measures that foist an alternative strategic transaction (e.g., a repurchase program or merger) on stockholders that prevents them from taking advantage of another acquisition offer. *Unocal's* coercion prong also permits the court to strike down de-

---

**74.** A percentage that neither of the parties has specified.

**75.** *Unitrin*, 651 A.2d at 1380–81.

**76.** *Id.* at 1383.

fensive measures that coerce stockholders into supporting the continued control of management.[77] The Charter and Bylaw Amendments are not coercive in either of these senses.

I also refuse to endorse the proposition that it was inherently wrongful for the Gaylord board to hold the vote on the Amendments at a time when it knew it could easily secure their passage. If the Amendments themselves were neither coercive, preclusive, or unreasonable in their effect, the mere fact that the board chose to put them in place rapidly through a vote it knew would succeed does not render the board's response disproportionate. This type of quibbling with a board's decisions seems inconsistent with the more deferential *Unocal* analysis articulated in *Unitrin*.

On this score, the evidence would, I suppose, enable one to conclude that the plaintiffs have the better argument regarding whether there was an exigent *need* for Gaylord to have all of its defensive measures in place as soon as the expiration occurred. That is, I acknowledge that the adoption of the pill *might* have offered sufficient protection until a post-expiration vote could be held, given

the short period of time an acquiror would have had to launch and win a proxy contest to remove the board.[78] That is, the Charter and Bylaw Amendments may not have been necessary as of that time.

But the fact that one might have decided that question differently than the board did is not sufficient to create a genuine issue for trial unless one believes that the facts would support a finding that the board's contrary judgment was outside the range of reasonable responses to the circumstances.[79] In my view, the board's decision to put into place seamless defensive coverage efficiently cannot be deemed an unreasonable approach to the situation it faced. Nor was the board bound, if it believed an earlier vote was advisable, effectively to accelerate the expiration of the dual class voting structure by timing any action on the Amendments to occur after the expiration of that structure. The board's decision to take the most expedient and certain route to ensuring the adoption of Charter and Bylaw Amendments it deemed in the best interests of Gaylord and the company's stockholders does not constitute an independent basis for invalidating the board's action.[80]

**77.** For example, the adoption of a poison pill that can only be redeemed by continuing directors or their designated successors has been found to coerce stockholders into voting for the continuing directors because otherwise the pill could not be redeemed. *Carmody v. Toll Bros. Inc.*, Del. Ch., 723 A.2d 1180, 1195 (1998).

**78.** Plaintiffs' expert Professor Bebchuk points out that the window of opportunity for an acquiror to replace the Gaylord board before a post-expiration vote on the Amendments could be held was quite narrow, because the pill was a substantial deterrent. Pls. Ex. W (Report of Lucian A. Bebchuk), at 19-21. While Bebchuk ignores the possibility of removing the board by a proxy fight during that period, such a lightning-strike approach would no doubt have been difficult to pull off.

**79.** *Unitrin*, 651 A.2d at 1386 (holding that it was error for the Chancery Court to substitute its "business judgment" for that of the board by finding a defensive measure unreasonable simply because it was, in the trial court's view, "unnecessary"); *Mentor Graphics Corp.*

*v. Quickturn Design Systems Inc.*, Del. Ch., 728 A.2d 25, 40 ("the guiding principle is reasonableness, not perfection"), *aff'd sub nom.*, Del.Supr., *Quickturn Design Systems, Inc. v. Shapiro*, 721 A.2d 1281 (1998).

**80.** Although not argued by the defendants at this stage, *see* note 32, *supra*, I note that the Supreme Court has stated that "[a] *Unocal* analysis should be used only when a board unilaterally (i.e., without stockholder approval) adopts defensive measures in reaction to a perceived threat." *Williams v. Geier*, 671 A.2d at 1377 (*citing Unocal*, 493 A.2d at 954). Under the *Williams* approach, the Charter Amendments are not subject to heightened scrutiny because they were approved by a stockholder vote. Even though Pomerantz controlled the vote, the Charter Amendments did not implicate 8 *Del. C.* § 144 and were authorized by a board dominated by disinterested, independent directors. Thus *Williams* also supports a grant of summary judgment to the defendants.

Similarly, I also reject the plaintiffs' argument that the board's timing decision must be supported by a compelling justification under *Blasius Industries Inc. v. Atlas Corp.*[81] because the board knew that it would be more difficult to secure passage of the Amendments after expiration of the dual class voting structure. The defendants concede that it would have been challenging to obtain passage after that event because of the need to mobilize the electorate to cast their ballots.[82] Although the defendants do not concede the point, it seems obvious that the measures might not have obtained electoral support for another reason—their nature as defensive barriers.[83]

But it seems to me to be incongruous to hold that the defensive measures were, on the one hand, nonpreclusive and noncoercive in the traditional *Unocal* sense and within the range of reasonable responses but, on the other hand, invalid because the board chose the swiftest and surest method of securing their implementation. Put another way, I have reviewed the evidence and have concluded that the evidence would not support a finding of fact that the board was motivated by improper purposes (e.g., entrenchment) in its adoption of the defensive measures and further that there is no triable question regarding whether the defensive measures the board selected were within the range of reasonable responses. As a result, by securing the speedy enactment of those measures, the board cannot be said to have "acted for the primary purpose of thwarting the exercise of a shareholder vote."[84]

81. *Blasius Industries Inc. v. Atlas Corp.*, Del. Ch., 564 A.2d 651 (1988).

82. The plaintiffs' expert, Professor Bebchuk, and the defendants' expert, Georgeson & Company, both agree that it is difficult to mobilize the electorate to vote in proxy contests over charter amendments and that a fairly large percentage of shares (anywhere from the low teens to a quarter of the shares) may well not be voted. Pls. Ex. W (Report of Lucian A. Bebchuk Aff.), at 11–12; Defs. Ex. 33 (Georgeson Report), at 23–25 (because of the larger number of Gaylord shares held in street name brokerage accounts, opinion that it would have been difficult to obtain a majority vote and that to do so would have required "an extensive and expensive solicitation effort").

83. *Compare* Defs. Ex. 33 (Georgeson Report), at 24–25 (anticipating that stockholders would have supported the Amendments and that the real problem was simply getting enough turnout, but also indicating that only 15% of institutional investors would likely have supported the Amendments) *with* Pls. Ex. W (Report of Lucian A. Bebchuk), at 15–16 (indicating that a vote after the expiration might not have succeeded because shareholders hold different views on the advisability of defensive measures such as those adopted in this case but also acknowledging that "[m]any companies do have shareholder-approved anti-takeover amendments").

84. *Blasius*, 564 A.2d at 660; *see also Williams v. Geier*, 671 A.2d at 1376 (rejecting application of *Blasius* to a recapitalization that created a system of tenure voting because there was no evidence that the defendants' primary purpose for the recapitalization was to "impede the . . . stockholders' vote").

Nor can the plaintiffs take comfort in my opinion granting class certification. *In re Gaylord Container Corp. Shareholders Litig.*, Del. Ch., C.A. No. 14616, mem. op., 747 A.2d 71, 1999 Del. Ch. LEXIS 175, Strine, V.C. (Aug. 10, 1999). In that opinion, I concluded for several reasons that the non-management stockholders of Gaylord had adequately alleged individual injury (separate and apart from harm to Gaylord as an entity or the management stockholders of the company) flowing from the adoption of the defensive measures. That conclusion did not, of course, constitute a finding that any compensable or remediable injury in fact took place; instead, it was based solely on the facts pled in the complaint and not on the evidence developed through discovery. For example, I accepted the plaintiffs' premise that the shares held by Gaylord directors would be voted as a block, a premise that cannot be simply accepted at this stage. *In re Gaylord*, mem. op. at 2, 747 A.2d 71, 73, 1999 Del. Ch. LEXIS 127, at *3; *Unitrin*, 651 A.2d at 1380–81. Moreover, I went out of my way to emphasize that my decision on class certification was not a commentary on the merits of the plaintiffs' claims. *In re Gaylord.*, mem. op. at 32, 747 A.2d 71, 82, 1999 Del. Ch. LEXIS 175, at *41.

Indeed, it bears emphasizing that the prototypical case implicating so-called *Blasius* review involves a situation where: i) a stockholder vote or action by stockholder consent is imminent or threatened; and ii) the board purposely thwarts the opportunity for that vote or action to take place or takes steps to reverse the likely result (e.g., by reducing the voting power of a particular stockholder).[85] Neither situation is present here.

In fact, the situation in this case is far less compelling than existed in other cases in which Delaware courts have rejected *Blasius* review. In *Stahl v. Apple Bancorp., Inc.,*[86] for example, Chancellor Allen refused to employ *Blasius* to review a board's decision to change the company's planned annual meeting date when it appeared likely that the company's largest stockholder would be successful in electing an insurgent slate at that meeting. Because, among other reasons, that decision did not ultimately preclude a fair election in accordance with the company's bylaws, the Chancellor held that the *Blasius* standard of review was not implicated.[87]

Nor does the mere fact that the Amendments included a supermajority provision making it difficult for stockholders to undo them in the future—as the plaintiffs claim—raise an issue distinct from the core *Unocal* analysis. Supermajority provisions are common and lawful features of corporate charters. And all supermajority provisions, of course, make it more difficult for stockholders to act together to change company policy. Thus a principled basis for invalidating such a provision, unless its primary purpose is disenfranchisement or its effects on stockholder voting power reach a level beyond the pale of *Unocal,* is not readily apparent.

For all these reasons, I conclude that there is no dispute of fact that requires a trial regarding whether the defendants have met their burden under the *Unocal* test.

B. *The Plaintiffs Have Not Produced Evidence Sufficient To Support A Finding That The Presumption Of The Business Judgment Rule Is Rebutted*

In the preceding sections of this opinion, I have concluded that the plaintiffs have failed to produce evidence that would support a finding that: 1) the independence or disinterestedness of ten of the eleven Gaylord directors was compromised; 2) the Gaylord board acted without due care or for improper purposes; or 3) the defensive measures did not have a rational business purpose. Thus the plaintiffs have failed to

---

**85.** *See, e.g., Stroud v. Grace,* Del.Supr., 606 A.2d 75, 91 (1992) ("Almost all of the [*Blasius*-type] decisions involved situations where boards of directors deliberately employed various legal strategies either to frustrate or completely disenfranchise a shareholder vote."); *Blasius,* 564 A.2d 651 (board created and filled two new board seats on a seven-member board in specific response to written consent solicitation seeking to expand the board and install a new board majority and thereby absolutely precluded the election of a new majority); *Aprahamian v. HBO & Company,* Del. Ch., 531 A.2d 1204 (1987) (incumbent board moved annual meeting date when it learned that a dissident stockholder group appeared to have a majority of the proxies); *Phillips v. Insituform of North America, Inc.,* Del. Ch., C.A. No. 9173, mem. op., 1987 WL 16285, 1987 Del. Ch. LEXIS 474, Allen, C. (Aug. 27, 1987) (board issued stock to dilute the voting power of certain control shares).

**86.** *Stahl v. Apple Bancorp, Inc.,* Del. Ch., 579 A.2d 1115 (1990).

**87.** *Id.* at 1123 (Where board changed the date on which it intended, but was not legally obligated, to hold annual meeting so as to enable the board to explore alternatives to a proxy fight initiated by a large stockholder in connection with a tender offer the board considered inadequate, the court held that *Blasius* review was inappropriate. Because the board had no legal obligation to call a meeting in May and had not set a meeting date, because no proxies had been solicited, and because the board's action did not preclude stockholders from "effectively exercising [their] vote[s,]" the board's decision did "not itself constitute an impairment of the exercise of the franchise ... spark[ing] ... close judicial scrutiny").

produce evidence creating a genuine issue of material fact regarding whether the board's actions are entitled to the protection of the business judgment rule.

### IV. *Conclusion*

For the foregoing reasons, the defendants' motion for summary judgment is granted, and this case is hereby dismissed. IT IS SO ORDERED.